100 N.J. Super. 223 (1968)
241 A.2d 637
FRANCES MAGRINE AND ALFRED MAGRINE, PLAINTIFFS-APPELLANTS,
v.
DAVID SPECTOR, d/b/a PRECISION BUR COMPANY AND E.P. KEANE, INDIV. AND t/a KEANE DENTAL SUPPLY, DEFENDANTS. VINCENT KRASNICA, DEFENDANT-RESPONDENT, THIRD-PARTY PLAINTIFF,
v.
DAVID SPECTOR, d/b/a PRECISION BUR COMPANY AND E.P. KEANE, INDIV. AND t/a KEANE DENTAL SUPPLY, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1967.
Decided April 2, 1968.
*224 Before Judges KILKENNY, CARTON and BOTTER.
Mr. Lewis M. Holland argued the cause for appellants (Messrs. Warren, Chasan, Leyner & Holland, attorneys).
Mr. Geoffrey Gaulkin argued the cause for respondent (Messrs. Beggans and Keale, attorneys).
PER CURIAM.
Plaintiff-patient Frances Magrine brought action against defendant-dentist to recover for personal injuries sustained when a latently defective hypodermic needle broke or separated while it was being injected into her gum by defendant. Plaintiff Alfred Magrine sought to recover derivative damages.
The pertinent facts are set forth in Judge Lynch's opinion, reported sub. nom. Magrine v. Krasnica, 94 N.J. Super. 228 (Cty. Ct. 1967).
The stipulation of facts upon which the case was submitted included the following: Plaintiff makes no assertion or claim that defendant failed to do what a reasonably prudent person would have done under the circumstances or that defendant did what a reasonably prudent person would not have done. Plaintiff relies upon strict liability, breach of warranty and breach of contract to recover.
Judge Lynch, in an opinion in which he carefully reviewed the recent developments of the doctrine of strict liability and analyzed various policy decisions involved, concluded that judgment should be entered for defendant. Plaintiffs appeal.
The sole issue presented here is whether a dentist is strictly liable to a patient injured by a defective instrument used in the course of treatment. In our opinion, the imposition of liability on the defendant-dentist cannot be justified on the *225 basis of any of the accepted policies which underlie the doctrine of strict liability as it is presently understood. Nor are we persuaded that that doctrine should be extended under the circumstances of this case so as to render the defendant-dentist liable without fault for a defect in a needle which he merely purchased and used.
The judgment appealed from is therefore affirmed.
BOTTER, J.S.C. (temporarily assigned) dissenting:
The case comes up on a stipulation of facts. 94 N.J. Super., at pp. 229-230. Plaintiff, Frances Magrine, was injured by a hypodermic needle which defendant, a dentist, had injected into her gum. In the course of the injection the needle broke. Defendant believes "there must have been some sort of a defect in the needle." At oral argument we were told that an operation was required to extract the broken portion of the needle. Plaintiff does not charge defendant with negligence, but asserts strict liability in tort, relying on Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960); Santor v. A & M Karagheusian, Inc., 44 N.J. 52 (1965); Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434 (1965) and Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965).
The trial court denied recovery. Strict liability was refused because the dentist was engaged in a profession, not a large-scale business; he was not a manufacturer or supplier of the needle, but a user of it; he could not discover a latent defect in the needle; and precedent in this state has not yet applied the doctrine beyond manufacturers (Henningsen and Santor, supra), retailers (Henningsen, supra), suppliers such as rental companies (Cintrone, supra) and mass producers of homes (Schipper, supra). The majority of this court affirms.
I disagree with the views of my colleagues. As between an innocent patient and a dentist who causes injury by using a defective instrument the law should require the loss to be borne by the dentist, even if he is not negligent.
*226 The issue posed is as old as jurisprudence: when an innocent person is injured through the inadvertent conduct of another, who should bear the loss? The answer has varied with the epoch and environment. From ancient times until the 19th century the answer given generally was in favor of strict liability. Thereafter, with some exceptions, the basic rule has been to deny recovery against a defendant who is free of negligence. In the 20th century no liability without fault has been the basic premise, but it has been replaced through legislation by strict liability for industrial accidents (workmen's compensation) and for other specific activities such as ground damage by airplanes (N.J.S.A. 6:2-7) and dog bites (R.S. 4:19-16). In addition, the courts have restored strict liability in a broad area where a defective product or device has caused injury.
We may ask ourselves what objectives did the law seek in fashioning these rules of liability? In primitive cultures vengeance against the offending thing or person, not compensation, was a primary objective. Holmes, The Common Law, p. 34 (1881). If a man fell from a tree and died the tree was delivered to his relatives or was chopped to pieces. Id., pp. 11, 19, 24. Liability was visited upon the offending source, animate or inanimate, as well as persons connected with it, as if evil inhered in the instrument of harm. Wigmore, "Responsibility for Tortious Acts: Its History," 7 Harv. L. Rev. 315, 319 (1894) (hereinafter referred to as "Wigmore-I"). The reason may have been revenge or superstition or fear of an instrument of evil. It may have seemed just that "the damage which we have inflicted on others must be made good." Ehrenzweig, Negligence Without Fault, pp. 13-14 (1951).[1]
This sweeping rule caught all harm-doers; but the difference between intentional and accidental harm was recognized *227 at an early age in criminal law for the purpose of punishment[2] and in civil wrongs for the purpose of mitigating damages.[3] If a man's ox was killed by an ox whose owner was ignorant of its propensity "to push in time past," then "They shall sell the live ox, and divide the money of it; and the dead ox also they shall divide." Exodus 21:35, 36. This is one solution where both parties are blameless: have them share the loss. This approach has some parallel to workmen's compensation laws of the 1900's and to various suggestions made since the 1920's to compensate victims of motor vehicle accidents by a strict liability plan.[4]
In the 19th century fault  the failure to act as an ordinary prudent man  became the central condition of liability for unintentional harm. Brown v. Kendall, 6 Cush. 292 (Mass. Sup. Jud. Ct. 1850). The purpose that was championed *228 was the right of individuals and corporations to act freely and unburdened unless harm is done through their negligence. Some areas of strict liability continued at common law,[5] but the spirit of laissez faire and the momentum of the industrial revolution prevailed. "We must have factories, machinery, dams, canals and railroads," the court said in Losee v. Buchanan, 51 N.Y. 476, 484-485 (Ct. App. 1873), denying recovery without proof of negligence for damage to property caused by an exploding boiler. "By becoming a member of civilized society," the court said, "natural rights" must be surrendered, but a benefit is gained through the surrender by others of the same rights. "I hold my property subject to the risk that it may be unavoidably or accidentally injured by those who live near me; and as I move about upon the public highways and in all places where other persons may lawfully be, I take the risk of being accidentally injured in my person by them without fault on their part." In 1881 Holmes shared these views; however, he also suggested that deterrence of harmful behavior was a product of the rule that makes fault a condition of liability. Holmes, op. cit. supra, pp. 95-96.
In those days the problem was considered "on the assumption that plaintiff and defendant were alone involved and that what happened between them was the real issue  that tort liability was paid for out of the defendant's own pocketbook." 2 Harper & James, op. cit. supra, p. 762. The irony is that the fault rule, which was partly inspired by the desire to protect the growth of industry, was undone by the results of that very growth, namely, an increase in the harmful capacity of mechanized facilities, the inevitability *229 of accidents in their use and the consequent toll of human life and losses.[6] The expansion of the economy, the broadening of distribution of goods and services and the new pervasiveness of liability insurance are all part of the environment for the tort law of the 20th century. In this environment new views have taken shape about the objectives of the law. What has become dominant in our time is the need to compensate victims of normal conditions of daily life. "There is a tendency to revive the idea of liability without fault not only in the frame of wide responsibility for agencies employed, but in placing upon an enterprise the burden of repairing injuries, without fault of him who conducts it, which are an incident to the undertaking. * * * There is a strong and growing tendency, where there is no blame on either side, to ask in view of the exigencies of social justice, who can best bear the loss." Pound, The Spirit of the Common Law, pp. 188-189 (1921).
Assuring compensation for victims of accidents is a matter of public policy which legislatures have promoted in various ways.[7] Very recently the courts have come to serve *230 this purpose by expanding liability without proof of negligence in the area of "product liability." This result followed naturally the change in economic and social organization. So long as direct sales brought goods from a manufacturer to a consumer the law had little difficulty in affording relief in contract or in tort. When the process of manufacturing and distribution became extended and diversified, determining liability seemed more complicated. In contract the requirement of privity insulated the obligor on the belief that business transactions would become treacherous if liability were extended to persons beyond the immediate parties; and in tort, arising from contractual relations, the same fear of creating uncertain burdens was used to limit the scope of the duty of care to the immediate parties in the transaction. Winterbottom v. Wright, 10 M. & W. 109, 152 Eng. Rep. 402 (Ex. 1842), denying recovery to a coachman for injuries due to the collapse of a coach which defendant had a contractual duty to keep in good repair; see generally Kessler, "Products Liability," 76 Yale L.J. 887 (1967). Before MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (Ct. App. 1916), absent privity, a manufacturer was not liable to an ultimate consumer even though his injury was caused by negligence in the manufacture of the product.
With changes in production and marketing methods the courts looked for techniques to extend liability in favor of the ultimate consumer. The courts came to realize that the public interest required protection against defects in products which consumers must buy or use and against which they are helpless to protect themselves. Prosser, "The Assault *231 Upon the Citadel (Strict Liability to the Consumer)," 69 Yale L.J. 1099, 1122 (1960) (hereinafter referred to as "The Assault"). Representations of quality, express or implied, were held to run in favor of the consumer. The courts used various devices to overcome lack of privity, such as implied agency, third-party beneficiary and the like. Id. at p. 1124. Intricacies in the law of sales involving privity, warranties and disclaimer rights forced the courts to turn to the law of torts for a solution. Kessler, supra, 76 Yale L.J. at p. 895.
Through the Henningsen, Santor, Cintrone, and Schipper cases, supra, our Supreme Court has expressed the principles on which the doctrine of strict liability in tort is based. "The demands of social justice," the court said in Henningsen, supra, 32 N.J., at p. 384, require a rule of law that holds manufacturers and dealers liable for a defect in an automobile which causes injury to a consumer who, "has neither the opportunity nor the capacity to inspect or to determine the fitness of an automobile for use * * *." In Santor, supra, 44 N.J., at pp. 65-66 the court pointed out that the obligation is "an enterprise liability"[8] that does not depend upon "the intricacies of the law of sales" and that this "strict liability in tort is not conditioned upon advertising to promote sales." Cintrone, supra, makes it clear that there is no reason to restrict the rule to sales transactions. The obligation is implied in law, "as an incident of a transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel * * * and to distribute the losses which may occur because of a dangerous condition the chattel possesses." (Emphasis added). 45 N.J., at p. 446.
The trial court agreed with defendant's contention that strict liability should not apply to one who is not a manufacturer or large-scale supplier of goods but who merely *232 uses instruments acquired from others.[9] Obviously we cannot determine the rule of liability on the basis of the size or resources of one of the parties. Strict liability applies to all manufacturers, big and small, and in most states where the doctrine prevails it applies to retailers as well, big and small. In Henningsen, supra, the court held the dealer-retailer to strict liability. See also Prosser, "The Fall," supra, at p. 815. Moreover, in this situation the dentist is not a "consumer" of the hypodermic needle. The patient must be viewed as the "ultimate consumer." The dentist purchased the needle for use on his patients; it is they who are exposed to the risk of the instrument.
The injured patient should have the option of suing the dentist directly. It is the dentist with whom plaintiff has dealt and in whose hands and confidence the patient has put herself. It may be more difficult to sue a manufacturer or supplier located in a distant state or a foreign country. The dentist chose the instrument. The dentist is in a better position to know and prove the identity of the manufacturer or distributor. If he cannot, the patient should not be denied recovery on that account. The dentist should also know the quality of the instrument and the reliability of his source of supply. This rule may encourage greater caution in purchasing equipment and examining for defects.
*233 If an alleged manufacturer were sued other issues may arise. Here the needle was used eight times in a three week period. The dentist, not the patient, knows its history. The manufacturer may deny the existence of a latent defect and may assert that the instrument was used or cared for negligently. The parties best suited to litigate this issue are the dentist and the supplier. Prosser, "The Fall," supra, at p. 816. Often the real dispute will be between the insurance company for the dentist and the insurance company for the manufacturer, particularly where the source is in doubt or negligence in use is asserted.
The benefit that a patient receives in damages is not offset by an unfair burden placed on the dentist. The dentist does have a claim over against the supplier and manufacturer of the defective needle. He should know who they are in most cases. If strict liability would create higher insurance costs these costs may be mitigated through the claim over. Even without the claim over the loss may be distributed through fees for dental services or by insurance, the cost of which may be reflected in such fees.
Shifting the loss from A to B may not produce a net gain for society as a whole, but distribution of the loss does. Grad, "Recent Developments in Automobile Accident Compensation," 50 Colum. L. Rev. 300, 326-327 (1950); Cintrone, supra, 45 N.J., at p. 446; Prosser, "The Assault," supra, at p. 1120. Liability insurance is recognized as a means of distributing losses among the group involved in risk-producing activity. Prosser, "The Assault," supra, at p. 1120; see also concurring opinion of Justice Traynor in Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 462, 150 P.2d 436, 441 (Sup. Ct. 1944). But the trial judge agreed with Dean Prosser's view that insurance cannot and should not be used "to determine whether the group shall bear them (losses) in the first instance  and whether, for example, consumers shall be compelled to accept substantial price increases on everything they buy in order to compensate others for their misfortunes." Prosser, "The Assault," supra, *234 at p. 1121.[10] The argument is unrealistic and unpersuasive. Prof. James has replied that, "Today practically everybody worth suing is insured." James, "An Evaluation of the Fault Concept," 32 Tenn. L. Rev. 394, 397 (1965). Conard, supra, at pp. 45-50, note 54, shows that 98.8% of all payments for motor vehicle injury claims are received from insured sources. It is pointless to say that those who purchase goods should not be compelled to pay an item of cost for insurance to protect others. The protection is for the whole group. No one knows which consumer will be injured. The cost paid by each consumer assures his own satisfaction of a judgment if he gets one. The fact is that through the cost of goods and services consumers today do pay indirectly for insurance covering losses caused by the negligent activities of their suppliers. If this is just, granting consumer protection against defective products cannot be unjust.
The total compensation awarded for accidental loss by reason of tort liability and workmen's compensation is $3,178,000,000 annually. Conard, supra, at p. 45. These losses would be devastating without loss distribution. Corporations (such as some public utilities) which are large enough to insure themselves distribute the loss to the public through the price of goods and services. Business men, professionals and individuals, who have sufficient assets to protect, are likely to carry insurance under existing law. It must be remembered that even with strict liability the exposure to liability for negligence continues as before. The extension of strict liability for defective goods and utensils *235 merely expands the concept of tort liability. It has been called "negligence without fault." See note 8 above. Those who do not carry insurance and are judgment proof will probably be unaffected by this rule of law.[11]
Insurance plays another role in the formulation of a desirable rule. It interferes with the achievement of the objectives sought by the fault principle. An injuror was to pay damages because he was negligent. With insurance, however, the negligent man pays no damages, although he pays for his insurance. The loss is shared by all who insure with the same company, or by its stockholders or by those who are participants in the activity. It was also believed that the threat of liability for negligence would encourage prudent conduct. The existence of insurance diminishes this threat. Moreover, the strict liability rule does not discourage prudence but may actually encourage examination for defects which are not obvious. See Booth Steamship Co. v. Meier & Oelhaf Co., infra. Workmen's compensation laws have spurred safety consciousness by employers whose insurance rates depend upon loss experience. 2 Harper & James, op. cit. supra, § 13.5, pp. 771-777. Insurance companies themselves have applied some of their resources to safety goals. Ibid. In any case, the threat of liability for fault continues where strict liability applies. Lastly, the fear that lawful activities and growing industry would be unduly burdened by liability without fault is minimized by the loss-spreading effect of insurance.
*236 Occasionally we are told that it violates a natural sense of justice to require a defendant to pay damages when he is not at fault. Spangenberg, editorial, Trial, vol. 3 no. 6 (1967), answering current proposals for completely abolishing fault as a basis for liability in motor vehicle accident cases. See note 4 above. In my view our sense of justice is better served by the principle that holds a dentist accountable for injuries caused by a defective instrument which he has selected and used. The risk of harm to which an innocent patient is exposed by a defective instrument far exceeds the risk or burden which the dentist is asked to bear. The point may be made by reference to the automobile. Rollins, in "A Proposal to Extend the Compensation Principle to Accidents in the Streets," 4 Mass. L.Q. 392, 294 (1919) observed that in an impact between an automobile and a pedestrian the automobile can injure the pedestrian but the pedestrian cannot injure the automobile. The chances, he said, were all one way; and it is the automobile that gets the pleasure or profit but suffers none of the disadvantages. In such a case, he asks, who would say that it is unjust to have the motorist indemnify the pedestrian where both are blameless. It seems more unjust to leave the loss with the victim of an accident caused by a defective instrumentality which has the potential for harm.[12] It does not offend our sense of justice to place the loss on the one responsible for the instrument. The law has done this very thing throughout its history. Justice requires only that we apply the rule in appropriate cases. A retailer who sells a can of beans containing a latent defect is no more culpable than a dentist who uses an instrument with a latent defect. The patient probably places more reliance upon the dentist than he does on the retailer. Yet in the case of a sale the legislature has expressed the public policy of our state to compensate the victim by holding the seller to a warranty of fitness for use *237 despite his blamelessness. R.S. 46:30-21 (Uniform Sales Act), superseded by N.J.S.A. 12A:2-314(1) (Uniform Commercial Code); Griffin v. James Butler Grocery Co., 108 N.J.L. 92 (E. & A. 1931). It is not unjust to hold a dentist to the same responsibility.
Most of the cases of strict liability involve a manufacturer, distributor, retailer or lessor of goods. There are some cases which involve a defective commodity used or furnished by one rendering a service. Originally, serving food in a restaurant was considered a service, not a sale (Nisky v. Childs Co., 103 N.J.L. 464 (E. & A. 1927)), except by those who found it necessary to find a sale in order to allow recovery on an implied warranty basis. Sofman v. Denham Food Service, Inc., 37 N.J. 304 (1962); Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 Colum. L. Rev. 653, 660-662 (1957). The blood transfusion cases are in a similar category, since blood is furnished as part of medical or hospital service. Relief has been denied in a number of such cases. Perlmutter v. Beth David Hospital, 308 N.Y. 100; 123 N.E.2d 792 (Ct. App. 1954); Jackson v. Muhlenberg Hospital, 96 N.J. Super. 314 (Law Div. 1967). Farnsworth, supra, 57 Colum. L. Rev. at p. 672 recommends that strict liability should apply to blood transfusion cases. He points out that the recipient's reliance upon the supplier is great, the supplier is better able to bear the loss and distribute the risk, and the inability to detect or prevent contamination would not have prevented recovery in implied warranty if there had been a sale.
In Cintrone, supra, 45 N.J., at p. 454, the court relied upon Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310 (2 Cir. 1958). There, defendant contracted to overhaul the engine of a vessel. In the course of the work a wire strap was used to suspend a heavy object. A workman was injured when the strap parted because of a defect which could not have been detected by visual examination in the exercise of ordinary care. There was a dispute as to who supplied or had the duty of supplying the wire strap. The *238 court held that if the defendant contractor supplied the wire strap which failed to serve the purpose for which it was used then the contractor was liable for the resultant personal injury.
Although the court spoke in terms of a bailment or lease of the contractor's equipment, the facts indicate that the strap was used as part of the job being performed by the contractor. If the contractor furnished the strap he probably did not do so as a separate lease or bailment of his equipment, but rather to facilitate the work he had undertaken to perform. In this respect he is like the dentist in the case at hand. The court said:
"Although he is unable to prevent defects arising in the course of manufacture, his expert knowledge of the characteristics of the equipment in use should enable him to detect them more readily than the user. It is therefore not less reasonable as an incident of his contract to charge him with the duty of making tests, the omission of which would not constitute negligence, than it is to charge the manufacturer or retailer with a similar responsibility. We think that this is particularly true when the chattel is supplied, as it presumably was here, in the partial fulfillment of a general undertaking to make repairs. In such circumstances the hirer defers to the special qualifications of the contractor in both the selection and use of the equipment. Relying on the supplier's control of the work and with confidence in the supplier's expert knowledge and competence, he makes at most only a routine inspection of the equipment employed. To say that the supplier warrants the equipment merely confirms the customary reliance which flows from such a relationship and which affords an appropriate remedy.
"Applying general principles to the facts of this case, we find that the defect which caused the plaintiff's injury was not detectable by the ordinary visual inspection which the vessel's officers on the scene may be expected to make. Such latent defects in wire as are undetectable on visual inspection may result from improper manufacture or from fatigue resulting from use over a period of time. They may perhaps be discovered by subjecting the equipment to appropriate tests with safety factors in excess of the contemplated undertaking. Furthermore, it is the supplier and not the shipowner who knows the actual history of prior use of the equipment. He alone is in the position to establish such retirement schedules or periodic retests as will best prevent the development of visually undetectable flaws." 262 F.2d at p. 314.
*239 See also Butler v. Northwestern Hospital of Minneapolis, 202 Minn. 282, 278 N.W. 37 (Sup. Ct. 1938) and Aced v. Hobbs-Sesack Plumbing Co., 55 Cal.2d 573, 12 Cal. Rptr. 257, 360 P.2d 897 (Sup. Ct. 1961). Both cases hold that an implied warranty of suitability arises in non-sales cases, in one instance where a hospital furnished a defective metal clip for use by a special nurse in treating a patient who was hospitalized, and in another instance where economic loss resulted from the installation of defective heating tubes under a contract for labor and materials.
In France liability would attach in a case of this kind. Under Art. 1384 of the Civil Code an individual is liable for damage caused by the act of things in his charge, and this is interpreted to apply absolute liability for accidental injury due to a defect in the thing, such as a fracture of a metal part. Esmein, "Liability in French Law for Damages Caused by Motor Vehicle Accidents," 2 Am. J. Comp. L. 156, 158 (1953); Conard, supra, at p. 467. In England there are several cases in which recovery has been allowed for defective material furnished as part of service contracts. In G.H. Myers & Co. v. Brent Cross Service Co., (1934) 1 K.B. 46, 150 L.T.R. 96 (1933) the court held that if an automobile repairman selects the supplier of a connecting rod he is liable for damage caused by a defect in the rod which he installed in a motor. In Watson v. Buckley, (1940) 1 All E.R. 174 (K.B. 1939) plaintiff was allowed recovery against Mrs. Buckley, a hairdresser, for dermatitis resulting from a defective hair dye. The court held that there was an implied warranty from Mrs. Buckley that the dye was fit for use on plaintiff's hair, although she is not held to have warranted that the dye would work well or produce a given shade of color. In Dodd v. Wilson (1946) 2 All E.R. 691 (K.B.) a veterinary surgeon was held liable for injury caused by defective serum which defendant had purchased and injected into plaintiff's cattle. The court held that it was an implied "condition" in the contract between the parties that defendant would furnish a substance reasonably *240 fit for the required purpose. The court reasoned that if the serum had been sold to plaintiff and plaintiff had used it himself recovery would have been allowed under the Sale of Goods Act. Accordingly, the court saw no reason why the same obligation should not apply when the materials were furnished as part of a service.
Prof. Farnsworth suggests that courts should abandon the search for the qualities of a sale in a transaction and should apply strict liability in non-sales cases by analogous reasoning. Farnsworth, supra, 57 Colum. L. Rev. at p. 667. It is clear that he would recommend strict liability in the case at hand just as he declared in 1957 that it would soon be applied to the sale of housing (analogizing the mass producer of housing to the mass producer of goods) and to lessors of automobiles and other devices. 57 Colum. L. Rev. at p. 660.
Defendant's brief states that there is a "lack of scholarly comment" supporting the cause of action. It is true that few writers have focused on the specific area of service transactions as distinguished from sales, leases and bailments. However, I know of no academic comment opposing the application of strict liability to this type of case. As noted above, Prof. Farnsworth favors strict liability here. Significantly, however, most current scholarly comment urges the total abolition of the negligence-fault principle in accidental injury cases. See authorities cited in notes 4, 5, 8 and 12 above. The scholars, therefore, go far beyond the needs of this case.
The law of torts should seek to compensate the injured, to encourage safety practices and to distribute losses justly. 2 Harper & James, op. cit. supra, pp. 742-743; Calabresi, "Fault, Accidents and the Wonderful World of Blum and Kalven," 75 Yale L.J. 216, 238 (1965). These objectives may be taken to express the needs of justice. In my view these objectives are advanced by granting plaintiff an award in this case. Dentistry as an enterprise should pay its own way. Denying compensation is to require an injured person *241 who bears the loss alone to subsidize the risk-creating activities by which others profit.
For the foregoing reasons strict liability in tort should apply to a dentist who injures his patient by a latently defective instrument.
NOTES
[1] Prof. Ehrenzweig states that the principles of natural law have equally supported a theory of fault liability as well as absolute liability for harm done by the actor.
[2] Misadventure and self-defense were grounds for mercy or pardon in a criminal case. Wigmore, "Responsibility for Tortious Acts: Its History-III," 7 Harv. L. Rev. 441, 442-446 (1894); Wigmore-I, supra, 322-325. Exile to a city of refuge, but not death, was decreed for one who "killeth his neighbour ignorantly, whom he hated not in time past;" and this rule clearly included accidental killing. Deuteronomy 19:4, 5; Numbers 35:15-25. Lack of knowledge of prior harmful proclivities excused an owner for a death caused by his ox. Exodus 21:28-30.
[3] Wigmore-I, supra, 324; Winfield, "The Myth of Absolute Liability," 42 Law Q. Rev. 37, 41-42 (1926); Isaacs, "Fault and Liability," 31 Harv. L. Rev. 954, 966-969 (1918); 2 Harper & James, The Law of Torts, p. 749, n. 15, saying that it was not until the 19th century that lack of negligence succeeded as a defense to an action in trespass. See Bruch v. Carter, 32 N.J.L. 554, 562 (E. & A. 1867).
[4] Marx, "Compulsory Compensation Insurance," 25 Colum. L. Rev. 164, 179 (1925); Columbia University Council for Research in the Social Sciences, Report by the Committee to Study Compensation for Automobile Accidents 138 (1932); Ehrenzweig, "Full Aid" Insurance for the Traffic Victim  A Voluntary Compensation Plan (1954), also published in revised form, 43 Calif. L. Rev. 1 (1955); Keeton & O'Connell, Basic Protection for the Traffic Victim, p. 7 (1965). The Warsaw Convention applies a presumption of negligence with a limitation of damages for injuries to person and property occurring during an international flight. 2 Harper & James, op. cit. supra, pp. 850-851.
[5] Strict liability applied in blasting cases and other ultra-hazardous activities and in the application of respondeat superior, where the employer is liable for the negligence of an employee who acts within the scope of employment without any negligence on the employer's part in hiring or supervising the employee. 2 Harper & James, op. cit. supra, p. 812; Restatement, Torts, secs. 519, 520, pp. 41-47 (1938); James, "An Evaluation of the Fault Concept," 32 Tenn. L. Rev. 394, 396 (1965).
[6] In World War II 313,000 soldiers were killed, but 386,000 people were killed in accidents during the same period. 2 Harper & James, op. cit. supra, p. 729, n. 1. In 1966 113,000 people were killed and 50,851,000 were injured in accidents of all kinds; of these, 53,000 were killed and 3,712.000 were injured in motor vehicle accidents alone. National Safety Council, Accident Facts, p. 2-3 (1967). Total payments for personal injury tort claims and workmen's compensation exceeds three billion dollars per year. Conard, Morgan, Pratt, Voltz & Bombaugh, Automobile Accident Costs and Payments  Studies in the Economics of Injury Reparation, p. 45 (1964), (hereinafter referred to as "Conard").
[7] The Motor Vehicle Security-Responsibility Law (N.J.S.A. 39:6-23 et seq.) coerces insurance coverage on a broad scale. New York, Massachusetts and North Carolina have compulsory automobile insurance laws, and all states except Massachusetts have security-responsibility laws. Keeton & O'Connell, op. cit. supra, pp. 76, 106. In New Jersey a statute requiring compulsory automobile insurance was recommended in 1926 but was not adopted. Report of the Commission to Investigate the Subject of Compulsory Automobile Insurance, Assembly Joint Resolution No. 1 (1924). Within certain limits of coverage, the Unsatisfied Claim and Judgment Fund Law closes the gap left by the uninsured motorist, the stolen vehicle, the hit and run, unidentified driver, and other cases. N.J.S.A. 39:6-61 et seq. Workmen's compensation laws afford compensation for injuries and losses in the course of employment. The Temporary Disability Benefits Law protects against wage loss through non-occupational accident or illness. N.J.S.A. 43:21-25 et seq.
[8] "A new law of enterprise liability is in the making." Ehrenzweig, Negligence Without Fault, p. 2 (1951).
[9] In support of this conclusion the trial court (94 N.J. Super. at 236) quoted a portion of a paragraph from Prosser, "The Fall of the Citadel (Strict Liability to the Consumer)," 50 Minn. L. Rev. 791, 814 (1966). The remainder of that paragraph is as follows:

"The housewife who sells a jar of jam to her neighbor, or the man who trades in a used car on the purchase of a new one, will obviously stand on a very different footing so far as the justifiable reliance of third persons is concerned. It is also very probable that the rule will not apply to sales outside of the usual course of business, such as execution sales, or the bulk sale of an entire stock of goods for what they will bring after bankruptcy or a fire."
Clearly, Prosser was merely distinguishing types of sales in which a purchaser is not in "justifiable reliance" upon the seller. Dean Prosser was not addressing himself to the issue of applying strict liability to the user of a defective instrument as distingushed from suppliers of goods.
[10] Similarly, in 1881, Holmes said it was no more justifiable for a man to indemnify a neighbor against injury from his faultless acts than it would be to require him to insure his neighbor against lightning. Holmes, op. cit. supra, p. 96. Holmes derided the idea that the state might insure its citizens against accidents and distribute the burden amongst all citizens as well as provide "a pension for paralytics, and state aid for those who suffered in person or estate from tempest or wild beasts." But the state has come to do these very things in the form of medicare, disaster aid and unsatisfied judgment funds.
[11] The trial court said that the defendant may not be covered by his malpractice insurance because implied warranty claims require coverage for contract liability. The dentist's insurance policy is not before the court and I do not intend to decide that issue. The rare contractual warranty of a professional to effect a cure or to provide a certain result is different from the obligation which is termed strict liability in tort. See Santor, supra, 44 N.J., at 64, 66; Rosenau v. City of New Brunswick and Gamon Meter Co., 51 N.J. 130, 140-142 (1968); McCormack v. Hankscraft Company, Inc., 278 Minn. 322, 154 N.W.2d 488, 499-501 (Sup. Ct. 1967).
[12] See: Grad, "Recent Developments in Automobile Accident Compensation," 50 Colum. L. Rev. 300, 326-327 (1950).