812 A.2d 369 (2002)
356 N.J. Super. 233
Ronald P. BECKER, Plaintiff-Appellant,
v.
George J. TESSITORE, Defendant, and
Roadway Express, Inc., Defendant-Respondent.
Christopher Vitalone and Maureen Vitalone, Plaintiffs,
v.
George J. Tessitore and Roadway Express, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued November 14, 2002.
Decided December 19, 2002.
*370 Craig M. Rothenberg, Union, argued the cause for appellant (Rothenberg & Pashaian, attorneys; Mr. Rothenberg, of counsel and on the brief).
George P. Helfrich, Roseland, argued the cause for respondent (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Mr. Helfrich, of counsel and on the brief).
Before Judges NEWMAN, CARCHMAN and LANDAU.
The opinion of the court was delivered by *371 NEWMAN, J.A.D.
Plaintiff Ronald Becker appeals from a judgment entered in accordance with a jury verdict dismissing his complaint against defendant Roadway Express, Inc., (Roadway) for injuries sustained in an automobile accident and from an order denying his motion for judgment notwithstanding the verdict, or in the alternative, a new trial on damages only or a new trial on all issues. We affirm.
These are the relevant facts derived from the trial testimony. On June 30, 1995, Becker went out to eat with Christopher Vitalone[1] and three other friends. The group met at the Brookside Tavern in Morristown where they had dinner around 9:00 p.m. Becker specifically recalled drinking two bottles of beer, some red dinner wine and an after-dinner cordial while at the tavern.
Becker left the tavern around 11:30 p.m. to take Vitalone to a friend's house. He was driving his white and red Corvette convertible northbound on Interstate 287 at speeds of up to eighty miles per hour when he came up behind a Roadway tractor-trailer in the right lane. According to Becker and Vitalone, they heard a loud bang and saw a piece of debris fly out from underneath the left side of the trailer. The debris became lodged in the Corvette's front-left tire well and Becker lost control of the vehicle. The Corvette turned perpendicular to the roadway, traveled forward until it impacted the rear of the trailer and then slid onto the shoulder, rebounded, hit the tractor near its gas tank, and spun to a stop. Vitalone struck his head on the passenger side window support and had to be pulled out of the vehicle by Becker. Both men were transported to the hospital in ambulances.
Becker was released from the hospital after three hours. He was driven to the scene of the accident where he saw pieces of his car in the roadway, skid marks, and a tire fragment sitting on the shoulder nearby. Later that afternoon, Becker returned and took photographs of the area. At some subsequent date, which he did not specify, Becker again returned and picked up the tire fragment, which he gave to his attorney.
Gary A. Derian, a mechanical engineer, testified on behalf of plaintiffs as an expert in tire design and tire failure analysis. Derian examined the tire fragment that Becker provided and determined that it had been retreaded twice. The first retread bore a Roadway brand. The second retread was not done by Roadway, but rather was the product of a "Bandag" process.
Bandag is a patented retreading method that is licensed to authorized dealerships which perform the actual retreading work. Bandag is an Iowa corporation, which markets the rights to employ the Bandag method by granting franchises to independent business organizations. See Bandag of Springfield, Inc. v. Bandag, Inc., 662 S.W.2d 546, 549 (Mo.Ct.App.1983). Although the Bandag process was clearly identified by branding on the tire sidewall and the tread pattern, there was no way to determine which Bandag dealership actually made the retread. As of 1997, Bandag *372 had approximately 510 franchisees in various parts of the country. See Boyer v. Bandag, Inc., 943 S.W.2d 760, 762 (Mo.Ct. App.1997). Derian was also unable to discover the identity of the tire's original manufacturer.
Derian explained that all radial tires have steel belts that are bonded to the carcass of the tire and remain with the tire for its entire life. When a tire is retreaded, the tread is replaced but the original belts are not. Over the course of tens of thousands of miles, separations can occur between the belts in a tire carcass. A tire carcass in which the belts have separated should never be retreaded.
Based upon his observations of a large area of separation between the belts and polishing between the plies, Derian concluded that the failure of the tire in question was caused by a belt separation. Due to the large amount of tread remaining on the tire, he determined that the failure occurred very shortly after the second retreading. He could find no other cause for the blow-out as the tire fragment showed no evidence of a puncture or impact break.
According to Derian, the original tire wore out and was retreaded using a Roadway retread. There was no problem with the Roadway retread; it was done properly. By the time the first retread wore out, the tire had developed separations between the belts. Because Roadway no longer operated retreading facilities, the tire was sent to a Bandag dealership for retreading. Before a tire is retreaded, it must be inspected carefully for belt separations using either x-rays or holographic imaging. However, the Bandag dealership failed to detect the separations in the tire and retreaded it. When the retread was placed on the trailer, the weight of the new rubber increased the forces within the tire and the weakened belts blew apart within a short time.
Derian testified that Roadway is very knowledgeable about the retreading process and had a responsibility to ensure that the retreading company that it used followed good procedures and made a quality retread. He admitted that there were no industry standards or governmental regulations that required Roadway to inspect the tires it received from the Bandag dealership. In fact, he stated that "[o]nce a tire is back in Roadway's hands after being recapped, there's nothing they can do to that. Roadway wouldn't have the facilities to inspect it." Notwithstanding, Derian opined that Roadway could examine a tire before sending it for retreading to look for an uneven wear pattern on the tread or cracks between the belt and the tread.
George Tessitore testified that he was driving the Roadway tractor-trailer that was involved in the accident. Before leaving the Tannersville, Pennsylvania garage that night, he performed a routine safety check on his vehicle and did not notice any problems. Between 11:30 p.m. and 12:00 a.m., he was driving northbound on Interstate 287 at about fifty miles per hour when he was suddenly struck in the right rear by Becker's car. He had not seen the Corvette prior to feeling the force of the collision.
After Becker and Vitalone were taken from the scene, Tessitore made a visual inspection of the tractor-trailer accompanied by a state trooper. They spent about fifteen minutes walking around the vehicle and kicking the tires. He did not notice that any tire was flat or missing tread. Tessitore explained that if tread had come off his tire as Becker claimed, it would have damaged his mud flap, fender, and turn signal. He observed no such damage to the left rear of the trailer. He was confident that he did not have a blow-out that night. He was also sure that he *373 did not run over anything in the roadway immediately prior to the accident.
Tessitore drove the tractor-trailer away from the scene and stopped at a diner. After finishing his meal, he discovered that one of the tires on the right rear of the truck was flat. When the tire was changed, Tessitore noticed that it was not missing any tread.
Officer Joseph Torres of the New Jersey State Police testified that he arrived at the scene of the accident at around 12:15 a.m. When asked what happened, Becker stated, "I was in the right lane when I heard a big bang, I lost control. I really can't remember what happened next." Torres observed skid marks on the roadway and a tire fragment on the right shoulder, two-tenths of a mile behind the accident scene. He took a quick walk around the tractor-trailer to make sure that it could be driven safely away from the scene. Other than damage from the impact in the extreme rear of the trailer and on the right side of the tractor near the gas tank, he did not see anything out of the ordinary. He had no recollection of seeing anything unusual about the tires.
Torres subsequently interviewed Becker at the hospital. Becker was excited, his eyes were bloodshot and he had an odor of alcohol on his breath. A blood sample was drawn for a blood alcohol test.
James L. Barnhard testified that he is an independent trucker who was driving his tractor-trailer on northbound Interstate 287 on the night of the accident. He did not know any of the parties to the lawsuit and had never worked for Roadway. Immediately prior to the accident, he saw a car in his side-view mirror that was traveling "inordinately fast." At first, Barnhard believed that the car was a police vehicle because it was traveling so fast and he continued to watch it. The car passed another truck that was behind Barnhard and cut across the lane in front of it. The car then cut abruptly from the left lane to the center lane, then back to the left lane and passed Barnhard at a high rate of speed. Barnhard estimated that the car was traveling at 100 miles per hour when it passed him. After passing Barnhard, the car "made a sharp right cut across the two lanes into the far right lane." At that point, Barnhard used his amateur radio to contact the State Police and report the car for reckless driving. As Barnhard continued to watch the car, it suddenly began to spin out. He did not see the car hit anything before it went out of control. The car struck the right side of a Roadway tractor-trailer immediately in front of it, continued careening in a circle, and finally came to rest on the center concrete divider.
Barnhard stopped to see if he could render any assistance. When he got to the Corvette, the passenger had a gaping wound in his forehead and there was a smell of alcohol in the vehicle. Becker told him that a tire blew out on the tractor-trailer and caused him to lose control, prompting Barnhard to look around for a piece of tread laying on the roadway. He did not see any tire debris in the vicinity of the accident. Tessitore was visibly shaken by the accident, so Barnhard walked around the tractor-trailer with his flashlight inspecting the tires. He bumped all of the tires with his flashlight and found that they were all intact. He did not notice any tread separation on any of the tires on the tractor-trailer.
Dr. John Brick testified on behalf of defendants as an expert in biological psychology with a specialty in alcohol pharmacology and the behavioral effects of alcohol. The blood sample taken from Becker at the hospital revealed a blood alcohol content of .10. In order to get that test result, Brick calculated that Becker would *374 have had to consume eighty-seven ounces of beer, or just over seven standard drinks, while at the tavern. At the time the blood sample was drawn, Becker's blood alcohol content was descending.
At the time of the accident, Brick calculated that Becker's blood alcohol level would have been .10 and ascending.
Brick explained that "[t]he primary way in which alcohol impairs behavior is by impairing divided attention, the ability to divide your attention among many different variables." Based upon Becker's erratic driving, inability to control his motor vehicle, and slow and slurred speech after the accident, Brick concluded that alcohol had intoxicated and impaired Becker's functioning on the night of the accident. "[H]e drank more alcohol than he alleged and he was, in fact, intoxicated and impaired by alcohol at the time that he lost control of his vehicle and crashed, and ... his intoxication was a significant contributing risk factor to the happening of this accident."
John Desch, a civil engineer, testified on behalf of defendants as an expert in accident reconstruction. Reviewing photographs of the skid marks made by Becker and using specialized instruments to measure the coefficient of friction of the roadway, Desch calculated that Becker's speed at the time the Corvette began moving sideways across the roadway was seventy-eight miles per hour.
Desch stated that the physical evidence at the scene was not consistent with Becker's version of the accident. He explained that if a tire tread gets pinned in a wheel well, it has the same effect as a locked wheelthe car will start to decelerate. If two vehicles are traveling at the same speed and the rear vehicle starts to decelerate, it will not be able to catch up to the vehicle in front. The state trooper identified a tire tread on the shoulder two-tenths of a mile, or 1000 feet, behind the accident scene. If the tire carcass had become lodged in the Corvette 1000 feet before the accident, the Corvette would never have caught up to the truck. Even if it had been traveling at 100 miles per hour, the Corvette could have stopped within 500 feet. For that reason, Desch opined that the tire fragment found two-tenths of a mile from the scene was not related to the accident.
Desch did not believe that Becker struck an obstacle in the roadway to precipitate the accident. Oversteering at excessive speed alone was clearly capable of causing Becker to lose control of the car. He concluded that the accident was caused solely by Becker's high speed, erratic driving behavior, and alcohol impairment.
Heath Traver, a tire supervisor with Roadway, testified concerning standard operating procedures at the Tannersville garage. Traver worked for Roadway for twenty-five years and was in charge of all tire-related activity at Tannersville. Prior to being dispatched, tractor-trailers are sent through a check line where they are given a thorough safety inspection. Tires are examined by a mechanic, who removes bald or damaged tires from the vehicle. Such tires are later inspected to determine if they are suitable for retreading. The tire sidewalls are examined with a fluorescent light in order to detect lumps, distortions, weathering or bead separations. The tread is inspected for cracks or punctures. The age of the tire is noted. The tire is then placed on a spreader and the inside is examined for bubbles, punctures or other signs of damage. At that point, the determination is made whether the tire is retreadable.
Traver explained that twice a week a truck from Service Tire in Allentown, the Bandag dealership utilized by the Tannersville garage, comes to pick up tires designated *375 for retreading. The driver sorts through the tires, rolling them across the floor and inspecting the insides. Bandag has the right to reject any tire and refuse to retread it.
As part of Traver's job, he inspects the Service Tire facility once a month to ensure that it is retreading tires according to Roadway standards. Once a tire reaches the Service Tire facility, it is again placed on a spreader and examined. If it passes the preliminary inspection, it is sent to the "NDI," which is a combination x-ray and buffing machine. The tire is inflated to twenty psi, rotated and x-rayed. The NDI machine produces a report which reflects the integrity of the tire casing. If there is a break in the steel belts, the tire is not retreaded. Sometimes the heat of the curing process causes defects to emerge, so after a tire is retreaded and cured, it is placed back on the spreader to be examined. If the tire passes this inspection, it is returned to Roadway. When Roadway receives a retread from Bandag it is visually inspected. The tire is rolled to determine whether the treads are even and matched. It is then pressurized to 100 psi and held twenty-four hours before being installed on a truck.
Traver stated that a new truck tire costs approximately $300, whereas a retread costs $180.
With regard to the tire fragment recovered by Becker, Traver testified that it was originally owned by Roadway. It was first retreaded by the Rahway Tire Company, an exclusive Roadway retreader. It was then worn down and was presented again for retreading. Traver stated that Roadway may have presented it for retreading or it may have been salvaged from a scrap pile and presented by someone else. Bandag has thousands of customers aside from Roadway and other companies have lower standards than Roadway.
Traver stated that the first time he saw the tire fragment it was covered with dry, crusted autumn leaves and the belts were rusty, indicating that it had been outside for a long period of time. "The condition of this steel did not happen in the seven hours it laid out in the highway. This tire has been outside for over a year." The jury was subsequently instructed that Traver was not an expert witness and that it should disregard any of his statements that it believed to be opinions. Neither party challenges the court's instruction on appeal.
In both opening and closing statements, Becker presented alternate theories of fact. His counsel argued that either the tire fragment was expelled from the Roadway tractor-trailer following a blow-out or it was laying on the highway and run over by the tractor-trailer, thus propelling it backward toward the Corvette. In finding negligence on the part of Roadway, the jury did not specify which set of facts it had adopted.
On appeal, Becker raises the following issues for our consideration.
Point I
THE COURT ERRED IN REFUSING TO ALLOW THE CASE TO GO TO THE JURY AS A PRODUCT LIABILITY CLAIM.
A. ROADWAY IS A PRODUCT MANUFACTURER.
B. ROADWAY IS A PRODUCT SELLER.
Point II
THE COURT SHOULD DIRECT THAT A VERDICT BE ENTERED IN FAVOR OF PLAINTIFF/APPELLANT BECKER AND DIRECT A NEW TRIAL AS TO DAMAGES ONLY.
Point III *376 THE COURT ERRED IN PERMITTING NON-PROBATIVE AND HIGHLY PREJUDICIAL TESTIMONY ON THE ISSUE OF ALCOHOL CONSUMPTION/INTOXICATION TO GO TO THE JURY.
Point IV
THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE CREDIBLE EVIDENCE.
Point V
THE COURT COMMITTED REVERSIBLE ERROR BY FAILING TO PROVIDE THE JURY WITH THE SUDDEN EMERGENCY CHARGE.

I.
Becker argues that the court erred in refusing to allow the jury to consider his claim of products liability. He contends that under N.J.S.A. 2A:58C-8 Roadway is strictly liable as both a manufacturer and a seller of the retread tire. He claims the court erred in not considering Roadway's role in the retreading process and in not recognizing that Roadway produced the first retread which subsequently became a component part of the second retread. Further, he argues that Roadway is a seller of the retread tire because it installed the retread on its truck, it labeled the retread with its brand, it was responsible for the retread's repair and maintenance, and it placed the retread into the stream of commerce. In support of his argument, Becker relies heavily upon a case which pre-dates New Jersey's products liability statute, Cintrone v. Hertz Truck Leasing and Rental Serv., 45 N.J. 434, 448-51, 212 A.2d 769 (1965).
Judge Zucker-Zarett addressed the legal viability of Becker's theory of products liability. In response to Roadway's motion to dismiss the products liability claim, she phrased the issue as: "When a product is altered or modified at the request of an individual, does that individual then become the manufacturer of the product for purposes of strict liability?" The judge dismissed Becker's arguments based upon Cintrone, distinguishing it as a contract action and not a products liability case. She reserved judgment on the motion and asked the parties to provide her with relevant case law.
Ultimately, Judge Zucker-Zarett ruled that the issue of strict products liability would not go to the jury. In so doing, she reasoned that the basis of products liability was to protect the consumer from defective products that were designed or manufactured improperly. However, in that context she found that Roadway was neither a manufacturer nor a seller of the retread tire. She noted that Roadway was not the manufacturer of the original tire and found that it was also not a reconditioner or manufacturer of a component part of the retread. She observed that Roadway did not design, formulate, produce, create, or make the retread. Further, if a manufacturing defect was present in the retread, it was the result of the work done by the Bandag dealership. The judge concluded that the tire was manufactured by a tire manufacturer and retreaded by Bandag. Roadway was not required to be the insurer of its suppliers. It also was not in the business of selling tires. Although Roadway might have been negligent for failing to inspect or maintain the tire, it was not strictly liable for the tire's failure.
At the close of the evidence, Judge Zucker-Zarett refused to alter her ruling on the products liability issue. She found that Roadway was simply a user of the retread tire and that the unknown Bandag dealership was its manufacturer and seller.
In denying Becker's motion for a new trial, Judge Zucker-Zarett again reviewed *377 her reasoning for dismissing the products liability claim. She stated that "either the original tire was defective, or Bandag's process was defective. There was nothing to suggest that the component part which had been the original recap, was defective in any way." The judge specifically cited Zaza v. Marquess & Nell, Inc., 144 N.J. 34, 65, 675 A.2d 620 (1996), as imposing liability only when the component part manufacturer is responsible for the defective condition and found that the component which Roadway manufacturedthe first retreadwas not the source of the defective condition in the tire. She emphasized that Roadway was not involved in the sale of the tire, but rather employed it for its own use. Under the circumstances, she concluded that there was nothing to indicate that Roadway is liable under the products liability statute.
The Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to -11, defines a products liability action as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. 2A:58C-1(b)(3). The PLA provides that "[a] manufacturer or seller of a product" is liable in a products liability action "if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose" because it contained a manufacturing defect, failed to contain adequate warnings or instructions, or was designed in a defective manner. N.J.S.A. 2A:58C-2. Roadway did not dispute that the portion of the tire presented by Becker contained a manufacturing defect that rendered it unsafe for its intended purpose. It contended, however, that it was neither a manufacturer nor a seller of the retread tire.
N.J.S.A. 2A:58C-8 defines "product seller" as:
any person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce. The term "product seller" does not include:
(1) A seller of real property; or
(2) A provider of professional services in any case in which the sale or use of a product is incidental to the transaction and the essence of the transaction is furnishing of judgment, skill or services; or
(3) Any person who acts in only a financial capacity with respect to the sale of a product.
This definition encompasses entities within a product's chain of distribution and is consistent with most prior New Jersey case law. See Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 395-96, 451 A.2d 179 (1982) (rebuilder held strictly liable for defects in reconditioned machine); Newmark v. Gimbel's Inc., 54 N.J. 585, 595, 258 A.2d 697 (1969) (hairdresser strictly liable for defective permanent wave applied to customer's hair); Cintrone v. Hertz Truck Leasing, supra, 45 N.J. at 452, 212 A.2d 769 (truck leasing company strictly liable for defects in trucks); Docteroff v. Barra Corp. of Am., Inc., 282 N.J.Super. 230, 239-41, 659 A.2d 948 (App. Div.1995) (holding company which owns stock in a manufacturer but does not participate in company's activities not strictly liable); McLaughlin v. Acme Pallet Co., 281 N.J.Super. 565, 571, 658 A.2d 1314 (App.Div.1995) (joint compound manufacturer who supplied its product on wooden *378 pallets was responsible for defect in pallet); Sabloff v. Yamaha Motor Co., Ltd. 113 N.J.Super. 279, 289-90, 273 A.2d 606 (App.Div.) (motorcycle manufacturer strictly liable for defective installation of wheel by dealership), aff'd, 59 N.J. 365, 283 A.2d 321 (1971); Magrine v. Krasnica, 94 N.J.Super. 228, 240, 227 A.2d 539 (Cty. Ct.1967) (dentist not strictly liable for defective hypodermic needle), aff'd sub nom Magrine v. Spector, 100 N.J.Super. 223, 241 A.2d 637 (App.Div.1968), aff'd, 53 N.J. 259, 250 A.2d 129 (1969).
N.J.S.A. 2A:58C-8 might appear to be at odds with Zaza v. Marquess & Nell, Inc., supra, 144 N.J. at 64-65, 675 A.2d 620. There, the Court held that a component part manufacturer was not strictly liable under the PLA because it had constructed the component in accordance with specifications provided by the owner and the component was not itself defective or dangerous. Ibid.
Under N.J.S.A. 2A:58C-8, a component part manufacturer can be deemed a product seller. However, the product seller can avoid liability simply by identifying the responsible manufacturer pursuant to N.J.S.A. 2A:58C-9. As the component part manufacturer would have to know the identity of the owner whose specifications it was following, the net result is the same as in Zaza. N.J.S.A. 2A:58C-8 and -9 simply allows a component part manufacturer to avoid responsibility more expeditiously and with fewer legal entanglements.
Because the definitions set forth in N.J.S.A. 2A:58C-8 are generally consistent with prior case law and the common law, the analysis and conclusions are substantially the same and will be applied to the facts before us.
Becker established that the retread tire had a manufacturing defect in the form of a separation between the steel belts. The steel belts are part of the main body or "carcass" of a tire that is constructed by the original manufacturer. They remain part of the carcass and are not replaced, no matter how many times the tire is retreaded. When a tire is retreaded, the worn layer of rubber on the surface of the tire is buffed down and a new layer of rubber is affixed to the tire. This new layer of rubber is placed directly on top of the carcass containing the steel belts.
The tire was thus manufactured by an unknown original manufacturer who was responsible for constructing the steel belts within the carcass. Roadway purchased the tire and used it through a normal lifetime, which is about 100,000 miles. Roadway then retreaded the tire itself and again used it until it wore out. At that time, Roadway presented it for retreading. The Bandag dealership removed the worn tread from the tire's surface and replaced it with "green" tread from its own stores. When it was finished, the retread was a new product, consisting entirely of the original tire carcass, which was constructed by the original manufacturer, and the green tread, which was applied by Bandag. No component of the retread was constructed or supplied by Roadway.
N.J.S.A. 2A:58C-8 defines "manufacturer" as
(1) any person who designs, formulates, produces, creates, makes, packages, labels or constructs any product or component of a product; (2) a product seller with respect to a given product to the extent the product seller designs, formulates, produces, creates, makes, packages, labels or constructs the product before its sale; (3) any product seller not described in paragraph (2) which holds itself out as a manufacturer to the user of the product; or (4) a United States domestic sales subsidiary of a foreign manufacturer if the foreign manufacturer *379 has a controlling interest in the domestic sales subsidiary.
It is clear that, under this definition, Roadway is not a manufacturer of the retread. Roadway never held itself out as a tire manufacturer, nor is it a domestic sales subsidiary of a foreign manufacturer. Roadway did not design, formulate, produce, create, make, package, or construct the retread or any of its components. Roadway did label the tire, as the retread contained the word "Roadway" molded into rubber laying atop the sidewall. This labeling, however, was simply an artifact of the first retread that was not removed by the buffing process and did not contribute to the tire's functionality in any way. It was more a labeling of the first retreading process than of the tire itself. Roadway is not a manufacturer as defined in N.J.S.A. 2A:58C-8.
It also is clear that Roadway is not a product seller of the retread as defined in N.J.S.A. 2A:58C-8. Roadway is not in the business of selling tires or retreads nor is it a commercial retreader or tire repair service provider. Its business is not conducted for the purpose of selling, distributing, leasing, installing, or repairing retread tires. The use of retread tires is merely incidental to its trucking business.
Numerous cases have held that a business owner or service provider is not strictly liable in tort for defects in products used only incidentally in its business. In Magrine v. Krasnica, supra, 94 N.J.Super. at 242, 227 A.2d 539, this court held that a dentist was not strictly liable for a defective hypodermic needle that broke off in a patient's jaw. In so doing, we noted that a basic reason for imposing strict liability was to hold accountable those who place a product in the stream of trade and promote its purchase by the public. Id. at 234, 227 A.2d 539. The dentist had not placed the needle into the stream of commerce nor had he promoted its purchase. Id. at 235, 227 A.2d 539. Further, the dentist was not in the business of supplying the product to the patient, but rather was in the business of providing dental services. Ibid. The use of the hypodermic needle was only incidental to those services. Ibid. The court warned that holding the dentist strictly liable under the circumstances would result in strict liability being applied to any user of a defective article "which, through no fault of the user, breaks due to a latent defect and injures another. Id. at 241, 227 A.2d 539. It would apply to any physician, artisan or mechanic and to any user of a defective articleeven to a driver of a defective automobile." Ibid.
In Ranalli v. Edro Motel Corp., 298 N.J.Super. 621, 624-25, 690 A.2d 137 (App. Div.1997), we refused to apply strict products liability to a motel owner who supplied a guest with a defective cooking utensil. We recognized that strict products liability has been extended to persons other than manufacturers and sellers of goods, such as distributors and retailers, reconditioners and rebuilders, dealers in used items, providers of services necessarily involving use of a product, successor corporations, and lessors. Id. at 625, 690 A.2d 137 (citations omitted). However, this court refused to impose strict liability on the motel owner under the circumstances of the case because providing guests with cooking utensils was merely "incident to the primary use of the rented premises." Id. at 624, 690 A.2d 137. Because the motel owner had no continuing business relationship with the product manufacturer, "imposing strict liability makes him the last outpost of liability, even though he may be innocent of any wrongdoing." Id. at 628, 690 A.2d 137.
In Dixon v. Four Seasons Bowling Alley, Inc., 176 N.J.Super. 540, 546, 424 A.2d *380 428 (App.Div.1980), this court refused to extend strict liability to the owner of a bowling alley which supplied a defective bowling ball to a patron. We noted that the ball was only a portion of a larger service provided by defendant and concluded that "the use of the ball was incidental to the use of defendant's premises." Id. at 547, 424 A.2d 428.
Roadway's use of the retread tire is analogous to the dentist's use of the hypodermic needle in Magrine, the motel owner's use of cooking utensils in Ranalli, and the bowling alley's use of the bowling ball in Dixon. In each case, the owner of the defective item was engaged in a larger business enterprise to which the item was only incidental. The owner was not engaged in commercially selling a defective product to consumers and, hence, holding the owner strictly liable would not benefit the public by exerting pressure to make the product safer.
Roadway is not a "product seller" pursuant to N.J.S.A. 2A:58C-8 because it was not involved in placing the retread tire into the stream of commerce. Releasing a product "into the stream of commerce" means "that the product itself is presently and physically sold, leased or its possession exchanged." Woods v. Luertzing Corp., 167 N.J.Super. 156, 164, 400 A.2d 562 (Law Div.1979) (citing Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 64-65, 207 A.2d 305 (1965)). At no time did Roadway sell, lease or relinquish ownership of the tire. Although it did give possession of the tire to the Bandag dealership to be retreaded, this was in the nature of a bailment rather than an exchange of ownership.
In Gentile v. MacGregor Mfg. Co., 201 N.J.Super. 612, 621, 493 A.2d 647 (Law Div.1985), the court imposed strict liability upon the reconditioner of a defective football helmet. Evidence had established that each year the board of education sent its football equipment to a reconditioning company for reconditioning and post-season storage. Id. at 614, 493 A.2d 647. "The reconditioning process consisted of inspection of the helmet, replacement of broken parts ..., repainting ..., cleaning and sterilization." Ibid. The court specifically found that the board had not placed the helmet in the stream of commerce and observed that "[t]he helmet was and continued to be owned by the board; no passing of title occurred; thus there was no sale." Id. at 616, 493 A.2d 647. The court concluded that so long as a defect existed when the helmet was under the control of and distributed by the reconditioning company, that company could be held strictly liable for defects in the helmet's condition. Id. at 619, 493 A.2d 647.
The service provided by the reconditioner in Gentile is comparable to the service provided by the final retreader in the matter at hand. In both cases, a used product was presented by its owner to be reconditioned. The service consisted of a rejuvenation of the product, along with a representation that it was safe for its intended use. In neither case did the owner relinquish title to the product and thus the product was not placed into the stream of commerce. The role of Roadway is like that of the board of education in Gentile which was never regarded by the court as anything but an owner of the reconditioned product.
In support of his argument that Roadway was a product seller, Becker relies primarily upon Cintrone. There, the Court held that the lease of a truck from a rental business carried with it an implied warranty of fitness for the duration of the lease. Cintrone v. Hertz Truck Leasing & Rental Serv., supra, 45 N.J. at 445-46, 212 A.2d 769. The Court found no reason to restrict such warranties to transactions between *381 manufacturers and purchasers. Id. at 446, 212 A.2d 769. Thus, Cintrone represented one of the first in a long line of cases which imposed strict liability on entities other than manufacturers and sellers of goods. See Ranalli v. Edro Motel Corp., supra, 298 N.J.Super. at 625, 690 A.2d 137. In applying strict liability to the truck rental company, the Court reasoned that offering vehicles for hire to the public necessarily carried with it the representation that the vehicles were fit for immediate use and customers ordinarily relied on this representation. Cintrone v. Hertz Truck Leasing & Rental Serv., supra, 45 N.J. at 448-49, 212 A.2d 769. A bailor for hire, such as the truck rental company, places a vehicle into the stream of commerce just as does a manufacturer or retailer and thus should be held to the same standard of strict liability. Id. at 450, 212 A.2d 769.
Although Cintrone is important to the development of the common law of strict liability, it is readily distinguishable here. In Cintrone, the lessor was in the business of renting trucks to the public. The allegedly defective truck was the actual product that was placed into the stream of commerce. Roadway, on the other hand, is not in the business of constructing, renting or retreading tires and does not offer tires for sale to the general public. It did not place the allegedly defective tire into the stream of commerce. Furthermore, Cintrone was a contract action wherein the basis of liability was the leasing agreement between the truck rental company and the lessee, "Contract Packers." Id. at 452, 212 A.2d 769. No contract was involved in the matter at hand; Becker brought claims based only upon products liability and negligent maintenance.
Finally, comparing the facts and circumstances of Cintrone with those here, Roadway's role is analogous to that of Contract Packers, not to the rental company. Just as Contract Packers depended upon the rental company to provide it with a truck that was fit for immediate operation, Roadway depended upon the retreader to provide it with a tire that was safe for normal use. Contract Packers used the rented truck in the conduct of its principal business, just as Roadway used the retread in its trucking operation. Although Contract Packers placed the rented truck on the roadway and directed its employee to drive it, no issue of strict liability was present as to Contract Packers. We discern no basis in Cintrone to hold Roadway strictly liable for a defective retread.
"Products liability law is a matter of public policy." Zaza, supra, 144 N.J at 64, 675 A.2d 620. It is "based on concepts of fairness, feasibility, practicality and functional responsibility." Ibid. There is little question that defectively retreaded tires implicate matters of public safety and concern. It is certainly in the interest of the general public to ensure that all tires on all motor vehicles are safe for their intended uses. Holding Roadway strictly liable for a defective retread constructed by an independent contractor might encourage Roadway to inspect tires sent out for retreading more carefully or to dispose of unsuitable tire carcasses more conscientiously. Further, because Roadway could presumably avoid liability by simply identifying the tire retreader pursuant to N.J.S.A. 2A:58-9, imposition of strict liability might induce Roadway to keep better track of the identity of each tire's retreader, either through extensive product branding or a better inventory system.
Balanced against these considerations, however, is the expansion of products liability law that would result from a finding of strict liability in this case. Roadway and other businesses which utilize vehicles, equipment and tools as an incidental part of their operations would be subject to strict liability claims for unknown *382 and unanticipated product defects. Indeed, even private purchasers of retread tires might become strictly liable. This would impose a substantial economic burden on these businesses and individuals, without necessarily achieving the goal of enhanced product safety. "In developing steps towards higher consumer and user protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically." Zaza v. Marquess & Nell, Inc., supra, 144 N.J. at 65, 675 A.2d 620.
There is no precedent in this State to impose strict products liability on Roadway. Although the statutory definitions of "manufacturer" and "product seller" embrace the common law and include within their ambit numerous entities in a product's chain of distribution, they do not encompass a business operator whose use of a defective product is merely incidental to the provision of its primary service. Thus, Roadway should be viewed simply as a user of the retread tire, and as such, not strictly liable for defects in its manufacture. The trial court properly dismissed Becker's products liability claim.
Because we have concluded that the trial judge did not err in dismissing the products liability claim, we need not address defendant's second point which is predicated on holding Roadway to a strict products liability standard.
[Sections II, III, and IV of this opinion involving issues of the admissibility of Becker's intoxication, that the verdict was against the weight of the evidence and the court's refusal to provide the jury with the sudden emergency charge have been omitted from the published opinion].
Affirmed.
NOTES
[1] Vitalone is not a party to this appeal. As a passenger, the jury awarded him $2600 for lost wages and nothing for pain and suffering. Vitalone filed a motion for a new trial or alternately an additur. Judge Zucker-Zarrett concluded that the jury did not properly take Vitalone's pain and suffering into account and suggested that an additur was appropriate. If an additur could not be agreed upon, a new trial as to damages would be necessary. According to Becker's representation, Vitalone and Roadway reached an agreement on a damage amount.