948 A.2d 686 (2008)
400 N.J. Super. 529
Roger SMITH and Martha King Smith, his wife, Plaintiffs-Appellants/Cross-Respondents,
v.
ALZA CORPORATION, Gum Tech International, Inc., Health and Nutrition Systems International, Inc., Heritage Consumer Products, LLC, Insight Pharmaceutical Corp., Lee Capital Holdings LLC, Novartis Consumer Health, Inc., Novartis Pharmaceuticals Corporation, The Penn Traffic Company, J.B. Laboratories, Eric Kurths, Defendants, and
Steritek, Inc., Defendant-Respondent/Cross-Appellant.
Docket No. A-4277-06T1
Superior Court of New Jersey, Appellate Division.
Argued May 5, 2008.
Decided June 9, 2008.
*688 Alan H. Sklarsky argued the cause for appellants/ cross-respondents (Williams, Cuker & Berezofsky, Cherry Hill, attorneys; Mr. Sklarsky and Kevin Haverty, on the briefs).
Beth S. Block, Shrewsbury, argued the cause for respondent/ cross-appellant (Callan, Koster, Brady & Brennan, LLP, attorneys; Ms. Block and Danielle M. Hughes, on the brief).
Before Judges PARRILLO, S.L. REISNER and BAXTER.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiff Roger Smith, an Alabama resident, brought a products liability action in New Jersey against, among others, New Jersey-based defendant Steritek, Inc., after suffering a hemorrhagic stroke allegedly as a result of taking the diet drug Acutrim, an over-the-counter product containing phenylpropanolamine (PPA), which defendant labeled and packaged in bulk for sale. The motion judge summarily dismissed plaintiff's complaint finding that defendant qualified for "seller" immunity under N.J.S.A. 2A:58C-9.
The essential issue on appeal concerns the distinction between "seller" and "manufacturer" and presents the question whether a product packager or labeler is a "seller" entitled to statutory protection from strict liability or instead is a part of the "manufacturing" process otherwise subject to account for a product defect under New Jersey's Products Liability Act, N.J.S.A. 2A:58C-1 to -11. We adhere to the latter view based on the facts of record and therefore reverse the summary judgment dismissal of plaintiff's complaint. We also hold that under New Jersey's choice-of-law rules, the State's procedural and substantive law governs plaintiff's claims, including those under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to 8-20, over Alabama's counterparts.
The facts material to resolution of these issues are largely undisputed. Plaintiff was a 52-year old Army helicopter pilot residing in Alabama when the incident occurred on October 3, 1999. A few weeks earlier, he had been on temporary duty in Philadelphia where he purchased a small amount of Acutrim to help suppress his *689 appetite. Following his routine, while at home in Alabama on the afternoon of October 3, plaintiff ingested one pill before his daily workout. After exercising for about forty-five minutes, plaintiff fell ill and entered the shower. He has no recollection of what transpired next.
Plaintiff was found unconscious in the shower by emergency personnel who transported him to the local hospital where, appearing "comatose," he was intubated. A CT scan revealed a large intraparenchymal hematoma of the right posterior parietal occipital area. Plaintiff was transferred the next day to South Alabama Medical Center, where he underwent surgery for an emergency "right parietal occipital craniotomy [for] evacuation of intracerebral hematoma." He was eventually discharged on October 21, 1999 with a prognosis of likely permanent injuries.
Plaintiff's expert opined that plaintiff suffered a hemorrhagic stroke "due to the ingestion of Acutrim containing PPA." At the time, plaintiff had been in reasonably good health and had no known risk factors, including hypertension, for stroke.
Acutrim is an over-the-counter weight loss product that was advertised as providing maximum strength appetite control. On the front of the Acutrim package were the words "Safe, Effective Weight Loss-Works All Day." According to the label on the rear of the package, the active ingredient in Acutrim is PPA.
"Phenylpropanolamine [PPA] is a synthetic sympathomimetic amine commonly found in appetite suppressants and cough and cold remedies."[1] "Sympathomimetic" means
that it shares many of the same effects as stimulation of the sympathetic nervous system (fight or flight response) including cardiovascular effects (elevation of blood pressure and force of contraction of the heart) and central nervous system effects (increased alertness, anxiety).
There have been studies, reports, and articles dating back more than twenty years warning of the grave risks of PPA, such as (1) high blood pressure; (2) hemorrhagic stroke due to PPA's tendency to elevate blood pressure and narrow the cerebral vessels; and (3) seizures. Medical studies have concluded that PPA's risk-benefit ratio does not justify its clinical use, as it is "not an essential or irreplaceable medication because alternatives are available to treat each of its indications (nasal congestion, obesity), and have been for several decades."
Based on these reports, particularly a large scale epidemiologic study, known as the Yale Study, concluded in 1999, the Food and Drug Administration (FDA), which earlier declined to categorize PPA as safe and effective in 1985[2], and again in 1994[3], published a Proposal to Withdraw Approval in the Federal Register on August 14, 2001, declaring its intention to withdraw approval of all PPA containing products.[4]
Notwithstanding these reports, the labels of products containing PPA failed to *690 warn of the associated risks of increased blood pressure, hypertension and the potential for strokes. No such warnings were included on the Acutrim label.
Acutrim was manufactured by Michigan-based J.B. Laboratories (J.B. Labs), which shipped the finished tablets in bulk to Steritek, a New Jersey contract packager of a variety of healthcare, beauty and pharmaceutical products for packaging, labeling, and distribution. The packaging was actually provided by another Acutrim manufacturer, Heritage Consumer Products (Heritage).[5] Once received at its Moonachie plant, Steritek packaged the Acutrim tablets in "blister" packaging, placed the labeling on the boxes, put the boxes into cartons, and shipped the packaged Acutrim to an out-of-state distribution center designated by Heritage. Steritek's Executive Vice-President emphasized, however, that at no time during the period of its contract services  from 1999 to prior to the FDA's recall of PPA products  did Steritek maintain or exercise significant control over "the labeling, directions for use, warnings, or other consumer information placed or intended to be placed on the Acutrim product."
Plaintiff's original complaint named a number of defendants involved in the manufacture, packaging, and distribution of products containing PPA and alleged causes of action grounded in negligence, products liability for defective design and failure to warn, breach of express and implied warranty, and violations of New Jersey's Consumer Fraud Act, among others. The complaint was later amended to include Steritek.
Following discovery, Steritek moved for summary judgment arguing that under Alabama's statute of limitations, which does not recognize the "discovery rule," plaintiff's action is time-barred and, alternatively, that defendant was a "seller," N.J.S.A. 2A:58C-8, and therefore entitled to seller's immunity, N.J.S.A. 2A:58C-9. The motion judge, applying the "governmental interests" test, concluded that New Jersey procedural law applied, but that Steritek qualified for the statutory "product seller" exemption inasmuch as it did not "exert significant control over the manufacture of the product to hold them [sic] strictly liable." The judge reasoned:
In this case, the Court finds that Steritek was indeed a `product seller', because they distributed the product as recognized at oral argument, and packaged and labeled the product according to Heritage's specifications. The [c]ourt further finds that Steritek failed to exert the requisite control relative to the alleged defect, which would prevent them from utilizing the [N.J.S.A.] 2A:58C-9 escape provision.
Accordingly, the judge dismissed plaintiff's complaint.[6]
*691 Plaintiff appeals, maintaining Steritek is a non-selling "manufacturer" within the meaning of N.J.S.A. 2A:58C-8, and therefore not entitled to seller's immunity under N.J.S.A. 2A:58C-9. Defendant disagrees, and cross-appeals, arguing that plaintiff's complaint should be dismissed as time-barred under Alabama's procedural law and as not viable under that state's substantive law of products liability and breach of warranty. We hold that New Jersey law applies and that defendant is not entitled to statutory immunity under our law.
We address these points in the order presented.

(i)
"Product liability actions in New Jersey are governed by our Products Liability Act [(PLA)], N.J.S.A. 2A:58C-1 to-11." Banner v. Hoffmann-La Roche Inc., 383 N.J.Super. 364, 375, 891 A.2d 1229 (App. Div.2006), certif. denied, 190 N.J. 393, 921 A.2d 447 (2007). Liability under the PLA is limited to manufacturers and "product sellers."
A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.
[N.J.S.A. 2A:58C-2 (emphasis added).]
The distinction between a manufacturer and a "product seller" is of great import because "[i]n 1995, the Legislature enacted N.J.S.A. 2A:58C-8 to-9 (L. 1995, c. 141), which allows a seller of an alleged defective product to be relieved of liability under certain circumstances by filing an affidavit correctly identifying the manufacturer of the product." Claypotch v. Heller, Inc., 360 N.J.Super. 472, 483, 823 A.2d 844 (App.Div.2003). Thus, N.J.S.A. 2A:58C-9 provides:
a. In any product liability action against a product seller, the product seller may file an affidavit certifying the correct identity of the manufacturer of the product which allegedly caused the injury, death or damage.
b. Upon filing the affidavit pursuant to subsection a. of this section, the product seller shall be relieved of all strict liability claims, subject to the provisions set forth in subsection d. of this section. Due diligence shall be exercised in providing the plaintiff with the correct identity of the manufacturer or manufacturers.
c. The product shall be subject to strict liability if:
. . . .
(2) The manufacturer has no known agents, facility, or other presence within the United States; or
(3) The manufacturer has no attachable assets or has been adjudicated bankrupt and a judgment is not otherwise recoverable from the assets of the bankruptcy estate.
d. A product seller shall be liable if:
(1) The product seller has exercised some significant control over the design, manufacture, packaging or labeling of the product relative to the alleged defect in the product *692 which caused the injury, death or damage.
At issue here is whether Steritek, the packager and labeler of Acutrim, qualifies as a "product seller," as defined by the statute, and thus is eligible for exemption from liability under N.J.S.A 2A:58C-9, or is instead a "manufacturer" not cloaked with statutory immunity. Under the PLA, a manufacturer is defined as
(1) any person who designs, formulates, produces, creates, makes, packages, labels or constructs any product or component of a product; (2) a product seller with respect to a given product to the extent the product seller designs, formulates, produces, creates, makes, packages, labels or constructs the product before its sale; (3) any product seller not described in paragraph (2) which holds itself out as a manufacturer to the user of the product; or (4) a United States domestic sales subsidiary of a foreign manufacturer if the foreign manufacturer has a controlling interest in the domestic sales subsidiary.
[N.J.S.A. 2A:58C-8 (emphasis added).]
A "product seller," on the other hand, is defined as
any person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce.
[Ibid. (emphasis added)]
The likely purpose of including the definition of "manufacturer" in the 1995 legislation "was to distinguish between manufacturers and sellers for the purposes of application of the seller immunity provisions." Dreier, Keefe, & Katz, Current N.J. Products Liability & Toxic Torts Law, § 2:21 at 19 (2008 ed.).
While these definitions appear to overlap somewhat, there must nevertheless be a clear distinction drawn lest the Section 9 exemption be devoid of any meaning. See State v. Reynolds, 124 N.J. 559, 564, 592 A.2d 194 (1991) ("A construction that will render any part of a statute inoperative, superfluous, or meaningless, is to be avoided.") Or, stated differently, if every packager or labeler qualifies for the "product seller" immunity, their inclusion in the definition of "manufacturer," to whom strict liability may attach, would be rendered inoperative.
Clearly, packaging and labeling activity falls within the scope of the manufacturing function defined in Section 8. What Section 9 does, however, is to exempt those entities that package or label incidental or ancillary to their primary business of selling the product at issue. Thus, Section 9 defines a "product seller" as "any person who, in the course of a business conducted for that purpose . . . [,]" i.e. selling a product, may also engage in certain other incidental activities. N.J.S.A. 2A:58C-9 (emphasis added).
The plain meaning of the underscored language is to exempt from the strict liability of the PLA only those entities in the business of selling the allegedly defective product. Irrespective of whatever other activities a seller may be engaged in, the sale of the product is the defining characteristic for qualification as a "product seller." The statutory distinction, therefore, is between a manufacturer who may also sell its product and a seller who may perform functions otherwise encompassed within the broad definition of "manufacturing," but which are merely incidental to its business of selling the product. As to the latter, the performance of some "manufacturing" *693 activities does not necessarily render the seller a "manufacturer" subject to strict liability. Indeed, this distinction is highlighted in Section 9(d), which relieves a "product seller" of liability only if it had no significant responsibility for the alleged product defect and the "manufacturer" is amenable to service of process and is likely to be able to satisfy any judgment. N.J.S.A. 2A:58C-9(c), (d).
No reported decision by a New Jersey court has yet analyzed the strict liability of an entity whose activities are limited exclusively to product packaging or labeling. It remains clear, however, that the purpose of the product seller immunity provisions was "`to reduce litigation costs borne by innocent retailers in product liability actions.'" Claypotch, supra, 360 N.J.Super. at 485, 823 A.2d 844 (emphasis added) (quoting Sponsor's Statement to S. 1495 of 1995, enacted as L. 1995, c. 141). And, the cases in which Section 9 has been implicated have consistently involved either retailers or wholesalers, i.e. those engaged in the selling of products in one form or another. See Agurto v. Guhr, 381 N.J.Super. 519, 529, 887 A.2d 159 (App. Div.2005) (reversing trial court's grant of summary judgment on the basis that defendant qualified as a "product seller," and remanding for trial to resolve material disputes of fact on the issue of whether selling glue machines was part of defendant's business); Becker v. Tessitore, 356 N.J.Super. 233, 251, 812 A.2d 369 (App. Div.2002) (trucking company which initially retread its truck tires on its own was not a product seller because it did not place the product into the stream of commerce, i.e. the product itself (the retread tire) had not been "presently and physically sold, leased or its possession exchanged"); D.J.L. v. Armour Pharm. Co., 307 N.J.Super. 61, 89 n. 25, 704 A.2d 104 (Law Div.1997) (indicating that "those in the wholesale and retail chain of distribution" may qualify for the "product seller" exemption.)
By limiting the application of Section 9's immunity to retailers and wholesalers who have no significant responsibility for the alleged product defect, we thereby reconcile any overlap with Section 8 and avoid rendering the statutory distinction meaningless. Such construction also fully accords with the legislative purpose and design of the PLA, which is to impose strict liability upon entities within the chain of distribution. See Becker, supra, 356 N.J.Super. at 247, 812 A.2d 369 (the statutory definition "encompasses entities within a product's chain of distribution and is consistent with most prior New Jersey case law".) See also Magrine v. Krasnica, 94 N.J.Super. 228, 234, 227 A.2d 539 (Cty. Ct.1967), aff'd sub nom, Magrine v. Spector, 100 N.J.Super. 223, 241 A.2d 637 (App. Div.1968), aff'd, 53 N.J. 259, 250 A.2d 129 (1969) (the reason for imposing strict liability is to make those who put the product "in the stream of trade and promote its purchase by the public" accountable for injuries arising from the promotion and use of the product.) Section 9 carves out a very limited exception to the PLA's overarching principle of imposing strict liability upon all entities in the chain of distribution, exempting only those whose exclusive role is to make the finished, packaged and labeled product available to consumers.
Here, there is no evidence that Steritek ever sold Acutrim. Nor did defendant ever obtain title to the product throughout the entire manufacturing or distribution process so as to be considered a seller who exchanged ownership or passed title to the product in issue. See Becker, supra, 356 N.J.Super. at 251, 812 A.2d 369. On the contrary, defendant packaged, labeled and shipped the product in bulk to distribution centers for ultimate sale. While these activities are integrally *694 connected to the manufacturing process, N.J.S.A. 2A:58C-8, and represent the penultimate step in creating a finished product for sale, they nevertheless do not constitute the final act of "sale." As such, we conclude that defendant does not qualify as a "product seller" entitled to immunity from liability under N.J.S.A. 2A:58C-9.

(ii)
On cross-appeal, defendant contends that Alabama rather than New Jersey law applies to the procedural and substantive issues of this case. Its argument is essentially based on the claim that since plaintiff is an Alabama resident and ingested the Acutrim pill in that state, Alabama has "the overriding governmental interest." For the following reasons, we disagree.
Because plaintiff filed his action in New Jersey, the choice-of-law issue is analyzed in accordance with New Jersey rules. See Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106 (1996). Importantly, New Jersey has rejected the mechanical rule that the location of the injury determines the choice of law. See Veazey v. Doremus, 103 N.J. 244, 247, 510 A.2d 1187 (1986). Rather, New Jersey "applies a flexible `governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." Gantes, supra, 145 N.J. at 484, 679 A.2d 106.
"In applying the governmental-interests analysis, two steps are involved." Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621, 917 A.2d 767 (2007). The initial step entails an inquiry into whether there is an actual conflict between the laws of the interested states, a determination made on an issue-by-issue basis. Gantes, supra, 145 N.J. at 484, 679 A.2d 106; Veazey, supra, 103 N.J. at 248, 510 A.2d 1187. Absent any conflict, the forum state applies its own law to resolve the disputed issues. Rowe, supra, 189 N.J. at 621-22, 917 A.2d 767. If such a conflict exists, however, the next step is to determine "the state with the greatest interest in governing the particular issue." Veazey, supra, 103 N.J. at 251, 510 A.2d 1187. To do this, the court must "identify the governmental policies underlying the law of each state and how these policies are affected by each state's contacts to the litigation and to the parties." Id. at 248, 510 A.2d 1187.

(a) Procedural Law
Unquestionably, there is an actual conflict between New Jersey's and Alabama's statute of limitations. New Jersey follows the discovery rule for all tort claims, see R.A.C. v. P.J.S., Jr., 192 N.J. 81, 97-98, 927 A.2d 97 (2007), while, at the time of the motion judge's decision in this matter, Alabama applied the discovery rule only to fraud claims. See Ala.Code § 6-2-3 (1975); Cline v. Ashland, Inc., 970 So.2d 755, 756-58 (Ala.), cert. denied, ___ U.S. ___, 127 S.Ct. 2916, 168 L.Ed.2d 244 (2007).[7] Thus, without the aid of the discovery rule, plaintiff's cause of action would be time barred.
In light of this conflict, we turn to the next prong of the "governmental interest" analysis, which requires an identification of *695 the policies underlying each state's rule to "determine whether those policies are affected by the `state[s'] contacts to the litigation and the parties.'" See Rowe, supra, 189 N.J. at 623, 917 A.2d 767 (alteration in original) (quoting Fu v. Fu, 160 N.J. 108, 119, 733 A.2d 1133 (1999)). The Rowe Court further explained:
If the contacts of a state do not "align with the policies" relating to the disputed issue, then that state generally will not be found to have the greatest interest in governing the issue. So, for example, if a particular policy is designed to enhance a specific group and that group is neither a party to nor potentially affected by the litigation, then that state's interest is not aligned with its policy and it would be unlikely that that state would have the strongest governmental interest in deciding the issue.
[Ibid. (citations omitted).]
The public policy underlying Alabama's statute of limitations may be summarized as follows:
Statutes of limitations are founded in part at least on general experience that claims which are valid usually are not allowed to remain neglected, and that the lapse of years without any attempt to enforce a demand creates a presumption against its original validity or that it has ceased to exist. The basic principle most generally relied on by the authorities is that statutes of limitations are statutes of repose, the object of which is to prevent fraudulent and stale claims from springing up after long periods of time and surprising the parties or their representatives when evidence has become lost or the facts have become obscure from the lapse of time.
[Travis v. Ziter, 681 So.2d 1348, 1352 (Ala.1996) (citations omitted).]
The policies underlying New Jersey's statute of limitations are quite similar:
(1) to stimulate litigants to pursue a right of action within a reasonable time so that the opposing party may have a fair opportunity to defend, thus preventing the litigation of stale claims, and (2) to "penalize dilatoriness and serve as a measure of repose."
[Rivera v. Prudential Prop. & Cas. Ins. Co., 104 N.J. 32, 39, 514 A.2d 1296 (1986) (citations omitted).]
Significantly, however, unlike Alabama, New Jersey adheres to the discovery rule, which reflects New Jersey's
awareness that litigation can be time-consuming, expensive, and uncertain. Both the practice and the rule emanate from our attempt to balance the defendant's interest in repose with the plaintiff's interest in a just determination of his or her claim. The need to submit claims promptly to judicial management must be tempered by the policy favoring the resolution of claims on their merits.
[Viviano v. CBS, Inc., 101 N.J. 538, 547, 503 A.2d 296 (1986).]
See also O'Keeffe v. Snyder, 170 N.J.Super. 75, 85-86, 405 A.2d 840 (App.Div. 1979) ("[O]ur adoption of the `discovery rule,' applicable in other contexts, demonstrates our rejection of the notion that one can be barred from asserting a right before he was afforded a real opportunity to assert it."), rev'd on other grounds, 83 N.J. 478, 416 A.2d 862 (1980).
It remains to determine whether these differing policies are affected by the state's contacts to the litigation and the parties. See Rowe, supra, 189 N.J. at 623, 917 A.2d 767. In Gantes, supra, a products liability action filed in New Jersey by the representative of a Georgia decedent who was killed at work in Georgia allegedly by a defective product that had been manufactured in New Jersey thirteen years prior, the Court was faced with a similar choice-of-law *696 issue as here. 145 N.J. at 481-83, 679 A.2d 106. Under Georgia law, the plaintiff's lawsuit would have been time-barred because of a statute of repose that, in order to stabilize insurance underwriting and eliminate stale claims, prohibited products liability actions from being filed more than ten years after the original sale of the product. Id. at 485, 679 A.2d 106. New Jersey law, however, contained no such limitation and thus the plaintiff would be permitted to proceed because the suit was filed within New Jersey's two-year statute of limitations. Ibid.
Because of this conflict, the Court analyzed whether the policies that underlie the contrasting laws gave rise to a governmental interest, id. at 487, 679 A.2d 106, which depended, in turn, on "the nature of the contacts that the state has to the litigation and to the parties." Ibid. Applying this principle, the Court concluded that New Jersey had
a strong interest in encouraging the manufacture and distribution of safe products for the public and, conversely, in deterring the manufacture and distribution of unsafe products within the state. That interest is furthered through the recognition of claims and the imposition of liability based on principles of strict products-liability law.
[Id. at 490, 679 A.2d 106.]
New Jersey's interest in deterrence then had to be "compared and weighed against any governmental interest that Georgia ha[d] in applying its statute of repose in light of Georgia's contacts with the litigation and the parties." Id. at 493, 679 A.2d 106. The Court held that Georgia's interest in applying its statute of repose did not outweigh New Jersey's interest in deterrence because defendant was not a Georgia resident, nor had any contacts with Georgia:
The answer is clear. Georgia has no contacts with the defendant manufacturer or with this lawsuit. Hence, its special policy concerns over the impact of "open-ended liability" on its insurance industry and stale claims on its courts do not, in the context of this litigation, give rise to a governmental interest that must be protected by applying its statute of repose to foreclose this suit in New Jersey.
. . . .
Here, although the plaintiffs are Georgia residents, that contact with the State of Georgia does not implicate the policies of its statute of repose, which is intended only to unburden Georgia courts and to shield Georgia manufacturers from claims based on product defects long after the product has been marketed or sold. Consequently, the application of Georgia's substantive law in these circumstances does not dictate the inclusion of its statute of repose.
. . . .
Application of New Jersey law will not undermine Georgia's interest in compensating its injured residents because that interest is not actually implicated or compromised by allowing a products-liability action brought by Georgia residents to proceed against a non-Georgia manufacturer.
[Id. at 494, 496, 497-98, 679 A.2d 106]
The Court's reasoning in Gantes clearly has pertinence here. Alabama's interest in eliminating stale claims and protecting against open-ended liability of its domestic manufacturers will be neither fostered by applying that state's law, nor frustrated by the failure to apply it to non-resident entities such as Steritek, incorporated and operating in a foreign jurisdiction. In comparison, New Jersey has a substantial and distinctive governmental interest based on a strong policy of deterrence *697 that seeks to discourage domestic entities from the manufacture and distribution within this State of unsafe products through the allowance of a products liability action. See Gantes, supra, 145 N.J. at 494, 679 A.2d 106. Contrastingly, however, as comparable as Alabama's concern with deterrence may be, it is simply not advanced by application of its statute of limitations to a non-resident entity neither incorporated nor operating within its borders. And while incorporation alone may not be sufficient, see Heavner v. Uniroyal, Inc., 63 N.J. 130, 140, 305 A.2d 412 (1973), Steritek indisputably has "a significant presence in New Jersey by virtue of its doing business here[,]" sufficient to implicate the State's public policy and interest, which clearly prevail over that of Alabama. Gantes, supra, 145 N.J. at 488, 679 A.2d 106.
Steritek seeks to challenge this conclusion by arguing that it is not the actual manufacturer, but merely used packaging and labeling provided by another entity. We have already addressed this so-called distinction. Suffice it to say, packagers and labelers clearly fall within the definition of "manufacturer" under New Jersey's PLA. See N.J.S.A. 2A:58C-8; see also Dreier, Keefe & Katz, supra, § 12:1-1 at 333. As such, they are subject to strict liability, see N.J.S.A. 2A:58C-2, notwithstanding the fact that Steritek may not have had any control over the contents and design of the labeling. See Beshada v. Johns-Manville Prods. Corp., 90 N.J. 191, 204, 447 A.2d 539 (1982) (noting that "in strict liability cases, culpability is irrelevant"); Shackil v. Lederle Labs., Div. of Am. Cyanamid, Co., 116 N.J. 155, 204, 561 A.2d 511 (1989) (same).
Contrary to defendant's next argument, nothing in Rowe diminishes the preeminence of New Jersey's interest here. There, a Michigan resident sued a New Jersey corporation in New Jersey, alleging failure to warn of the health risks associated with Accutane, 189 N.J. at 617, 917 A.2d 767, a drug that was FDA approved. Id. at 618, 917 A.2d 767. The issue before the Court was whether to apply Michigan law, which provided that FDA approval of a drug resulted in a conclusive determination that the health risk warnings issued by a corporation regarding the drug were adequate, or New Jersey law, which only created a rebuttable presumption of adequacy under such circumstances. Ibid.
The Court held that under New Jersey choice-of-law rules, Michigan law applied. The Court distinguished Gantes, supra, noting that "New Jersey's interest in allowing Rowe's suit to proceed is not as strong as our interest was in Gantes." Id. at 625, 917 A.2d 767. Notably, unlike the Georgia statute of repose in Gantes and Alabama's statute of limitations here, the purpose of the Michigan statute implicated in Rowe was not limited to protecting domestic corporations. On the contrary, the Michigan law was also enacted to make "prescription drugs more available to [its] residents." Id. at 627, 917 A.2d 767. The Court elaborated:
[c]ommenting on section 600.2946(5) [the Michigan law at issue], its proponents stated that "[d]rug companies spend large sums of money and expend enormous energy getting approval for their products. Many valuable products never reach the market or are withdrawn because of successful lawsuits (or the threat of future lawsuits) even though there is no medical evidence that they are harmful." Supporters in the Michigan State Senate recognized that "[c]onsumers . . . suffer when they are denied new products that would increase public safety or improve their quality of life. . . . [P]roduct liability litigation . . . has added substantially to the cost and *698 unavailability of many goods and services."
[Ibid. (citations omitted) (alterations in original).]
Based on the preceding, the Court held that
[i]n this instance, where the challenged drug was approved by the FDA and suit was brought by an out-of-state plaintiff who has no cause of action in his home state, this State's interest in ensuring that our corporations are deterred from producing unsafe products-which was determinative in Gantes and however weighty in other contexts-is not paramount. Our interest in deterring local manufacturing corporations from providing inadequate product warnings, within the context of an FDA approved drug, must yield to Michigan's interest.
[Id. at 629-30, 917 A.2d 767 (footnote omitted).]
Rowe is clearly distinguishable. Here, the Alabama statute of limitations does not have the consumer-protectionist feature considered dispositive to the application of Michigan law in Rowe. In fact, we are at a loss to identify any governmental interest  much less a substantial one  that would be advanced by the application of Alabama's procedural law to the facts of this case. In contrast, given defendant's material connection to New Jersey by virtue of the fact that the allegedly defective product was packaged and labeled here and then shipped from this State, New Jersey's substantial governmental interest in deterring the manufacture and distribution within its borders of unsafe products amply justifies application of its discovery rule.

(b) Substantive Law
As with their statutes of limitations, there is also a conflict in the two states' substantive law of products liability. Under Alabama law, when an injured party sues a manufacturer for a defective product, Alabama follows the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), which "rejects the adoption of the pure strict tort liability theory." Atkins v. Am. Motors Corp., 335 So.2d 134, 137 (Ala.1976); see also Spain v. Brown & Williamson Tobacco Corp., 872 So.2d 101, 106 (Ala.2003); Entrekin v. Atl. Richfield Co., 519 So.2d 447, 449 (Ala.1987). In other words, "[Alabama] has specifically declined to adopt in total the strict liability concept of [Restatement (Second) of Torts] § 402A, preferring instead to retain the fault-based concepts associated with traditional negligence actions." Campbell v. Cutler Hammer, Inc., 646 So.2d 573, 576 (Ala.1994); Casrell v. Altec Indus., Inc., 335 So.2d 128, 132 (Ala.1976). According to the Alabama Supreme Court, a no-fault rule
puts the test of culpability in the quality of the product rather than in a standard of conduct resulting in the quality of the product; and it fails to distinguish between one whose conduct has contributed to its defective condition and one whose conduct has not so contributed. Indeed, candor requires a forthright admission that culpability in the traditional sense is lacking and any justification of the new tort theory must be founded on broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of those products.
[Atkins, supra, 335 So.2d at 139.]
In accordance with the concept of fault retained in Alabama products-liability jurisprudence, it is an affirmative defense to liability under AEMLD that "there is no causal relation in fact between [a defendant's] activities in connection with handling *699 the product and its defective condition." Id. at 143.
For example, the defendant may show that he is in the business or either distributing or processing for distribution finished products; he received a product already in a defective condition; he did not contribute to this defective condition; he had neither knowledge of the defective condition, nor an opportunity to inspect the product which was superior to the knowledge or opportunity of the consumer.
[Ibid. (footnote omitted).]
Alabama's rule clearly conflicts with New Jersey products liability law, which deems culpability as irrelevant in a cause of action based on strict liability. See Greenway Dev. Co. v. Borough of Paramus, 163 N.J. 546, 556, 750 A.2d 764 (2000) (In "a products liability manufacturing defect case . . . the plaintiff . . . is not required to prove fault.") For example, unlike New Jersey, under Alabama law, Steritek would be permitted to raise as a defense that they merely packaged Acutrim in packaging and labeling received from Heritage and thus, Steritek did not contribute to the defectiveness of the product.
We therefore next identify the policies underlying these substantive differences to determine whether those policies are affected by the "state[s'] contacts to the litigation and the parties." See Rowe, supra, 189 N.J. at 623, 917 A.2d 767 (quoting Fu, supra, 160 N.J. at 119, 733 A.2d 1133). The policy underlying Alabama's rejection of the no-fault concept is to afford business entities certain defenses not available under traditional no-fault strict liability.
The only real difference between strict tort liability and the traditional negligence theory in products liability cases is that those courts which have adopted the rule of strict liability look to the dangerous characteristics of the end product, rather than the methods or processes by which it was produced. This represents a shift in emphasis from the manufacturer's or retailer's conduct to the performance of his product. While the results may be the same when applied to the liability of any given defendantmeaning simply a defendant must pay the consequences of placing an unreasonably dangerous product on the marketit does not preclude a defendant from asserting as a defense against such claims the lack of any causal relationship between his conduct and the defective condition of the product.

[Atkins, supra, 335 So.2d at 140-41 (emphasis added).]
On the other hand, New Jersey's adherence to a no-fault theory of strict liability stems from encouraging the safe production of products among manufacturers. See Stephenson v. R.A. Jones & Co., 103 N.J. 194, 216, 510 A.2d 1161 (1986) ("[T]he central focus of this Court's strict products liability decisions has been to minimize accidents by encouraging the optimum investment in safety. `Unquestionably, it is in the public interest to motivate individuals in the context of commercial enterprise to invest in safety.'"); see also Coffman v. Keene Corp., 133 N.J. 581, 598, 628 A.2d 710 (1993). For these reasons, New Jersey has declined the opportunity to intertwine negligence concepts with strict liability. See Beshada, supra, 90 N.J. at 208, 447 A.2d 539; Freund v. Cellofilm Props., Inc., 87 N.J. 229, 239-40, 432 A.2d 925 (1981).
We are satisfied, as we were in the application of New Jersey's procedural law, that the nature of the State's contacts to the litigation and to the parties, and the strength of its underlying policies, are such to establish New Jersey's superior *700 governmental interest in applying its law of products liability. As noted, Steritek is a New Jersey corporation operating a business here that packaged and labeled Acutrim in New Jersey and shipped the product from this State. Defendant has no contacts with Alabama. Moreover, the conduct allegedly causing the injury occurred outside Alabama. As such, other than plaintiff's residency, Alabama has no discernable interest in extending its products liability law to defendant, which actually may operate as a hindrance to its resident obtaining full compensation for his injuries. New Jersey, on the other hand, has a strong interest in applying its no-fault strict liability law to Steritek to encourage the manufacture and distribution of safe products for the public and, conversely, to deter the manufacture and distribution of unsafe products within the State. Accordingly, on remand, New Jersey's substantive law of products liability should apply.

(c) New Jersey's Consumer Fraud Act
Lastly, defendant argues that under New Jersey's choice-of-law rules, Alabama's Deceptive Trade Practices Act (ADTPA) applies rather than the New Jersey Consumer Fraud Act (NJCFA). We disagree for reasons previously mentioned.
There is a distinction between the two. Under the NJCFA, treble damages and attorney's fees are mandatory, see Skeer v. EMK Motors, Inc., 187 N.J.Super. 465, 470, 455 A.2d 508 (App.Div.1982), while under the ADTPA, punitive damages are discretionary. See Ala. Code § 8-19-10(a)(2). New Jersey courts have concluded that this distinction is an actual conflict. See, e.g., Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 476 n. 5, 541 A.2d 1063 (1988); Huffmaster v. Robinson, 221 N.J.Super. 315, 319, 534 A.2d 435 (Law Div.1986); see also Heindel v. Pfizer, Inc., 381 F.Supp.2d 364, 374 (D.N.J.2004).
Although different in effect, the two statutes share similar legislative policies. The NJCFA
was enacted to "protect the consumer against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services."
[Scibek v. Longette, 339 N.J.Super. 72, 77, 770 A.2d 1242 (App.Div.2001) (citations omitted).]
Similarly, the legislature in enacting the ADTPA, declared: "[t]he public health, welfare and interest require a strong and effective consumer protection program to protect the interest of both the consuming public and the legitimate businessperson." Ala.Code § 8-19-2. Thus, while the laws of both states are premised on similar legislative goals of consumer protection, New Jersey's mandatory treble damages and attorney's fees provision provides a heightened level of protection. Nevertheless, the similarity of the underlying policies of both laws suggests application of the forum's law.
As does the nature of the contacts involved, qualitatively and quantatively. New Jersey is the site of the alleged deceptive practice and, as noted, has a substantial interest in deterrence. See Gantes, supra, 145 N.J. at 490, 679 A.2d 106. Alabama, on the other hand, although home to plaintiff, was not the situs where plaintiff purchased the Acutrim and has no direct relationship with defendant. Under the circumstances, because plaintiff purchased the Acutrim in Pennsylvania, he was thus not a consumer as defined under the statute. See Ala.Code § 8-19-3(2) (defining consumer as "[a]ny natural person who buys goods or services for personal, family or household use.") Indeed, any interest Alabama may have in compensating *701 its domiciliary, see Marinelli v. K-Mart, Corp., 318 N.J.Super. 554, 566, 724 A.2d 806 (App.Div.1999), aff'd, 162 N.J. 516, 745 A.2d 508 (2000), is better served by the NJCFA, which mandates punitive damages. Accordingly, New Jersey's interest in applying the NJCFA outweighs Alabama's interest, if any, in applying the ADTPA.
Reversed and remanded for proceedings consistent with this opinion.
NOTES
[1] Walter N. Kernan et al, Phenylpropanolamine and the Risk of Hemorrhagic Stroke, 343 New Eng. J. Med. 25, 1826 (2000).
[2] Cough, Cold, Allergy Drug Products for OTC Human Use, 50 Fed.Reg. 2, 220 (proposed Jan. 15, 1985).
[3] Final Monograph for OTC Nasal Decongestant Drug Products, 59 Fed.Reg. 43, 386 (final rule Aug. 23, 1994) (to be codified at 21 C.F.R. pts. 310, 341 and 369).
[4] Phenylpropanolamine  Proposal to Withdraw Approval, 66 Fed.Reg. 42, 665 (Dep't of Health & Human Servs. Aug. 14, 2001) (opp. for a hearing).
[5] In 1997, Novartis Consumer Health, Inc. sold a number of over-the-counter product lines, including Acutrim, to Heritage. Novartis refused, however, to sell or license the technology underlying the Acutrim time-release mechanism. Because Heritage was only a sales and marketing company, it had not only to find a manufacturer for the product but also another time release technology. Heritage thereafter contracted with J.B. Labs, a contract manufacturer of pharmaceuticals, and licensed a patented time-release process from a California company, Hauser-Kurhts, Inc. The sole shareholder of Hauser-Kurhts was Eric Kurhts. Additionally, Heritage contracted with Steritek to package the bulk product manufactured by J.B. Labs, place the labeling on the product, and send it out for final distribution.
[6] Novartis had also been granted summary judgment earlier, in 2005. Heritage, which ceased doing business in 2000, never answered plaintiff's complaint and default judgment had been entered against it in 2004. The remaining defendants, J.B. Labs and Kurhts, settled shortly before the scheduled trial date in 2007.
[7] Notably, on January 25, 2008, well after the motion judge rendered his decision on the choice-of-law issue, the Alabama Supreme Court, in Griffin v. Unocal Corp., No. CV-06-216, ___ So.2d ___, 2008 Ala. LEXIS 19 (Jan. 25, 2008), adopted the equivalent of the discovery rule, holding that "a cause of action accrues only when there has occurred a manifest, present injury." Id. at ___. The Court applied its holding to the case at bar and prospectively. Ibid. For present purposes, we assume, without deciding, that the Alabama law in place at the time of the motion judge's decision is controlling.